HERMAINE ROMANO *vs.* ROSSANO CONSTRUCTION
COMPANY, INC. & another.[1]

Suffolk.    December 8, 1960. — February 3, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, CUTTER, & KIRK, JJ.

*Negligence,* Contractor, One owning or controlling real estate.   *Nuisance.*

In an action against a contractor by a pedestrian on a street injured by
   falling on ice formed from water flowing onto it from "weep holes" in
   a retaining wall constructed by the defendant on adjacent land pur-
   suant to a contract with its owner, the evidence did not show that the
   defendant deviated from the plans and specifications of the contract, or
   that, if they were deficient as to drainage of the land and were followed
   by the defendant, danger by reason of the deficiency should have been
   realized by the defendant, or that the defendant was negligent in any
   other particular.   [723]
A contractor hired to construct a retaining wall on land pursuant to a
   contract with its owner was not shown to have had such relation and
   responsibilities with respect to the land and structures thereon as to
   make the contractor liable, on the ground of creating a "nuisance," to a
   pedestrian on an adjacent street injured by falling on ice formed from
   water flowing onto it from "weep holes" in the retaining wall.   [723–
   724]

TORT.   Writ in the Superior Court dated May 9, 1958.
The action was tried before *Morton,* J.
*Francis X. Carroll,* for the plaintiff.
*John J. C. Herlihy,* (*Arthur L. Brown* with him,) for the
defendant.

CUTTER, J.   The plaintiff seeks to recover for injuries
sustained when, on the evening of January 8, 1958, she fell
on a public way.   She alleged (count 1) that Rossano Con-
struction Company, Inc. (Construction), negligently col-
lected water upon city land upon which it was erecting
concrete walls and negligently discharged water in definite
channels, by means of holes in such walls, into the street,
where it formed an artificial accumulation of ice.   She
alleged also (count 4) that Construction created "a nui-

sance by the . . . construction work, so that an artificial accumulation of ice was formed.'' The case is here on the plaintiff's exceptions to the action of the judge in directing a verdict for the defendant on each count. The evidence is stated in its aspect most favorable to the plaintiff.

In January, 1957, the city started to build a school on a lot in East Boston with street frontage of about 360 feet. The lot had been open with some light shrubbery and small trees on it. Both before and after January, 1957, the land rose sharply from the street. Retaining walls were built at least twenty to twenty-five feet above a metal fence inside the sidewalk at the bottom edge of an embankment.

During the second half of December, 1957, ''fresh earth . . . was packed against the retaining walls'' and on the ''steep slope'' between the walls and the fence. A photograph shows that, in the retaining walls, at a level about eight to ten feet above the upper edge of the embankment, there were ''weep holes'' each apparently a little less than a foot in diameter, at intervals of about fifteen feet. Behind the retaining wall earth ''goes up nearly to the top of the wall . . . [and] above the weep holes.'' A witness testified that ''ice formed on the weep holes . . . and a considerable amount of water ran out from the weep holes down the ground, gouged out the dirt,'' and flowed ''over the sidewalk and into the street.''[2] ''[T]here is a sewer at the base of the fence between the sidewalls and the street'' and one ''just at the bottom of the incline on'' the street. This witness ''noticed'' that, on January 2, 1958, on the street, ''there was ice forming and out of the weep holes it was like ice . . . cascading out.'' This condition ''was building up'' during the next few days. ''[O]n January 7 . . . he observed the same thing, more ice on the ground than . . . before.'' The ''ice was one big mass . . . approxi-

[2] The evidence does not directly establish how the flow of water from the higher levels of the city lot was affected by the building operations. Even before any work was done the ground rose very sharply from the street and water must have flowed toward the street. The retaining walls, with weep holes above the ground level of the land between the walls and the street, may have tended to reduce or obstruct water collection and flow. We assume that it would make no difference whether the water coming through the weep holes was ground water or surface water. See *Deyo* v. *Athol Housing Authy.* 335 Mass. 459, 462–463.

mately 12 feet wide from the curb and . . . approximately
75 to 100 feet long." On that day, "there were gullies
in the dirt piled up in front of the retaining walls." These
gullies were filled in with more earth between January 8
and April 24, 1958, when some of the pictures were taken.
On January 8, 1958, there was a snow storm "about 3 or 4
inches." The plaintiff "never showed" this witness where
she fell. He "was not in that area on January 8," and
"did not know what the conditions were" on that day.

The plaintiff testified that at the time of the accident the
snow had not been plowed. She slipped and fell "about
six feet from the sidewalk" on some ice as she walked down
the street on "a clear night," in "car tire tracks." A man
tried to help her and he fell too. "[S]he observed that the
ground where she fell was ice, all ice underneath, as far
as she could see around her," and "the entire area was
covered with snow."

In February, 1957, Construction had entered into a con-
tract (with plans and specifications not in evidence) to
build a school on the city's lot. Retaining walls were put
up prior to October 7, 1957, and on that date Construction
was "notified to remove excavated materials deposited at
retaining walls." There was no evidence whether this had
been done. On January 3, 1958, progress was "slow due
to freezing weather conditions." On January 6, 1958,
crushed stone was placed "for area drains and trenching
for ground drain in area" which was "wet, muddy due to
thawing." The evidence does not disclose where the ma-
terials were placed or where the drains were to be. The
progress report for January 8, 1958, referred to "heavy
snow, rain during the evening of the 7th, working progress
. . . slow, slippery due to ice and snow accumulation."

An engineer, called by the plaintiff, testified that he had
studied the plans and specifications, that the water absorp-
tion qualities of the city land were very poor and it had a
high ground water level. There "was evidence of ground
water leaking out from the surface." The pictures indi-
cated to this witness "that there was water behind the wall
. . . [which] did not necessarily originate from under the

ground," although he could not say "whether it . . . seeped down through the dirt until it reached the weep hole." The purpose of the weep holes was not "to let water through" but "to relieve water pressure after construction has been completed." In the opinion of this witness "good construction practice, in addition to . . . weep holes . . . called for a ditching to remove the water that comes through those weep holes" which would "lead into the nearest place where you can dispose of" the water without inconvenience. The nearest place would be "one of the catch basins," the locations of which are not clear from the record.

There was no evidence about what the plans and specifications were or that Construction in any manner failed to follow them. From the testimony that progress reports were still being made, it could be inferred that Construction was still doing some work on the city lot. The evidence, however, did not show the extent of that work or of the responsibilities still resting upon Construction.

So far as appears, Construction was merely doing work that it was hired to do in the manner specified. The only suggestion in the evidence that the plans may have been in any respect deficient was the testimony of the engineer called by the plaintiff that good practice called for ditching. This testimony, however, did not disclose whether the plans failed to provide for proper drainage. This testimony also did not show that, if the plans were followed, the danger of improper collection and drainage of water was so apparent that a contractor like Construction should have appreciated the danger and realized that the plans were inadequate. Construction should be "charged with only so much competence to pass on plans as such contractors ordinarily have." The "standard of responsibility for the ordinary contractor is that usually possessed by persons in his place; and it should be proved like any other such fact." See *Person* v. *Cauldwell-Wingate Co. Inc.* 187 F. 2d 832, 836 (2d Cir.), cert. den. 341 U. S. 936. Beyond the circumstance that Construction was general contractor on the school building project, it was not shown whether Construction was an ordinary contractor or one specializ-

ing in particular work. There was no evidence about the extent of Construction's competence or about the expert knowledge of soil conditions the members of its staff had or should have had.

It is said in Restatement: Torts, § 384, "One who on behalf of the possessor of land erects a structure or creates any other condition" on the land "is subject to the same liability . . . as though he were the possessor" for physical harm caused to others outside the land while he is in charge of the work "by the dangerous character of the structure or other condition." This principle seems to be limited by § 384, comment f, which says, "The fact that the person erecting the structure or altering the physical condition of the land follows exactly the plans, specifications and directions of the possessor, does not necessarily prevent him from being liable under the rule stated . . . . A . . . contractor entrusted with such work is usually entitled to assume that the plans, specifications and directions given him are such as will make the work safe. But they may be so imperfect or improper that the . . . contractor should, as a reasonable man, realize that the work done thereunder will make the structure or condition unsafe. If so, he will be liable even though he exactly follows the plans, specifications and directions." The rule of § 384, comment f, was stated somewhat more strongly in *Ryan* v. *Feeney & Sheehan Bldg. Co.* 239 N. Y. 43, 46, "A . . . contractor is justified in relying upon the plans and specifications which he has contracted to follow unless they are so apparently defective that an ordinary builder of ordinary prudence would be put upon notice that the work was dangerous and likely to cause injury." Other relevant authorities are *Church of the Holy Communion* v. *Paterson Ext. R.R.* 68 N. J. L. 399, 403, *Lydecker* v. *County of Passaic,* 91 N. J. L. 622, 626, and Prosser, Torts (2d ed.) § 85, p. 519. See *Pearson* v. *Zable,* 78 Ky. 170, 174; *Willis* v. *J. G. White & Co.* 150 N. C. 199, 203–204; *Sutton* v. *Otis Elevator Co.* 68 Utah, 85, 107; *Thornton* v. *Dow,* 60 Wash. 622, 637–643.

We assume that Construction, at least while still carrying on the work (cf. *Cunningham* v. *T. A. Gillespie Co.* 241

Mass. 280, 282, as affected by *Flaherty* v. *New York, N. H. & H. R.R.* 337 Mass. 456, 460), would be liable for its own negligent acts or omissions causing injury to those to whom the city owed a duty of care. See *O'Neil* v. *National Oil Co.* 231 Mass. 20, 26; *Mikaelian* v. *Palaza,* 300 Mass. 354, 355–356; *Whalen* v. *Shivek,* 326 Mass. 142, 146–147; *Moore* v. *Worcester Insulation Co.* 338 Mass. 44, 45–46. The evidence, however, did not warrant finding any specific negligent act or omission on the part of Construction or that Construction failed to use due care in taking on the work in accordance with whatever plans there were. A verdict was properly directed for Construction on count 1 for negligence.

In considering count 4, we need not discuss a landowner's liability with respect to structures and artificial conditions placed upon his land, which cause water unreasonably to be collected and discharged, with the aid of some artificial channel, upon a public way. See *Troy* v. *Dix Lumber Co.* 300 Mass. 214, 216–217; *Harrison* v. *Poli-New England Theatres, Inc.* 304 Mass. 123, 124–125; *Hooper* v. *Kennedy,* 320 Mass. 576, 578–579; *Clark* v. *New York Cent. R.R.* 323 Mass. 690, 692; *Berman* v. *Massachusetts Bldg. Trust,* 332 Mass. 114, 115–116; *Cernak* v. *Kay-Vee Realty Co. ante,* 315, 318–319. See also *Cochran* v. *Barton,* 233 Mass. 147, 149–150; *Bullard* v. *Mattoon,* 297 Mass. 182, 186. Cf. *Kuklinska* v. *Maplewood Homes, Inc.* 336 Mass. 489, 492–493. We also need not discuss whether the evidence would have been sufficient to charge the city with any such liability or whether such a liability of the city would have rested on negligence or on some more strict theory of fault. See *Bullard* v. *Mattoon,* 297 Mass. 182, 186; *Tomasunas* v. *Khoury,* 314 Mass. 754, 755. Cf. *Delano* v. *Mother's Super Mkt. Inc.* 340 Mass. 293, 296–297, 299–301. The plaintiff in any event cannot recover on count 4 because she has not established that Construction, rather than the city itself, was maintaining any artificial condition or structure upon the city land. Construction at most has been shown to have been upon the city land (cf. *Brazinskos* v. *A. S. Fawcett, Inc.* 318 Mass. 263, 265) only for the limited purpose of the

building work. The scope of its responsibilities on the land has not been proved. It has not been shown (a) that Construction had any power to control or affect the plans in accordance with which it worked or the design of the walls and grounds, or (b) that it unreasonably proceeded under the plans. So far as appears, it could not deviate from the city's plans and did not do so. In the light of the authorities already cited (which seem consistent with Restatement: Torts, § 384, comment f), we think that a verdict was properly directed for Construction on count 4.

*Exceptions overruled.*