Hattie ARNOLD, Respondent,

v.

John H. EDELMAN and T. Lowrie Lyon,
a Partnership, d/b/a Edelman-Lyon
Company, Appellants.

No. 49683.

Supreme Court of Missouri.

Division No. 1.

Jan. 13, 1964.

Motion for Rehearing or to Transfer
to Court En Banc Denied
Feb. 10, 1964.

Roy F. Carter, Kansas City, Sprinkle, Carter, Sprinkle & Larson, Kansas City, of counsel, for appellants.

Albert J. Yonke, Kansas City, for respondent.

HOUSER, Commissioner.

Action for damages for personal injuries sustained by a city employee using the revolving doors in City Hall in Kansas City. Plaintiff Hattie Arnold sued the contractors who installed the doors, John H. Edelman

and T. Lowrie Lyon, a partnership, for $100,000. A jury returned a verdict for $36,000. Defendants have appealed from a judgment against them for $30,000, to which figure the verdict was reduced by remittitur.

Plaintiff charged negligent failure of defendants to set the panic-exit device on the revolving doors at the proper pressure to prevent collapse of the doors while being used in the normal manner.

City Hall is 30 stories high. Multi-story buildings create draft problems. They act like a chimney. Heated air rising through elevator shafts and stair wells (called "wind stack draft") creates a pressure which tends to draw air into the building through doors and openings on the first floor. This pressure allows infiltration of cold air. Ordinary swinging doors, which are constantly being opened and closed, do not bar these drafts. Swinging doors are hard to open against such pressure, which at times amounts to 50 pounds. Revolving doors, which can be activated with from 2 to 5 pounds pressure, were designed to solve this problem. They admit persons to a building without any free passage of air, overcome the pressure and eliminate influx of cold air. Persons using a revolving door must pass through in single file. This limits the number who can pass through in a given time. In case of an emergency people will try to go through both sides of the center post and jam or bunch up, making exit impossible and creating a dangerous condition.

For safety purposes revolving doors have a built-in safety device called a panic-exit device. This is a spring-loaded ball that fits into a socket at the top and bottom of each of the four leaves, which separate the sections of the revolving door. When excess pressure is applied the ball is forced out of the socket and the leaf releases and folds into an outward position. This leaves two clear openings, one on each side of the center post, allowing a constant stream of people to make an emergency exit without

having to wait to go through the revolving door one at a time. A "tensioning arrow" at the top of the doors makes it easier to force the ball out of the socket and thus fold the wings. By turning the tensioning arrow the pressure on the wings is reduced $\frac{5}{16}$.

A panic-exit device may be set to release upon application of pressure to the outer stile of the door within a range of from 60 to 180 pounds, as governed by building regulations. An effort is made to adjust the mechanism tight enough not to collapse the doors in ordinary use by pedestrian traffic, but not so tight as to prevent their collapse in emergencies. The optimum release adjustment involves several factors which determine the pressure exerted by wind stack draft: the difference between the temperature within and without the building; the number of openings in the building; the number of elevators being operated; the number of windows open; the height of the building; its location with respect to other buildings; prevailing winds; amount of pedestrian traffic through the doors, and the exhaust and ventilating systems of the building.

Defendants entered into a contract with the city to replace the revolving doors in City Hall and construct and install new ones and related mechanisms, and to furnish all labor and materials to do all work necessary to complete the improvement according to specifications. The specifications required the wings to be held in radial position by means of a stainless steel ball engaging in the top and bottom disc of each wing, and provided that excess pressure on the wings, greater than 60 pounds and less than 180 pounds, applied on the outer stile at a point 42 inches from the floor, shall force the ball from the socket and leave the wings free to collapse, and that tension shall be adjustable but that its maximum shall not prevent collapse of the wings. It was defendants' responsibility under the contract with the city to examine the site of the work, be familiar with the specifi-

cations, the conditions affecting the work, the amount of work to be done, and to complete the work according to specifications. Under defendants' contract with the manufacturer, by which defendants were employed and acted as factory representatives, defendants agreed to perform necessary services in connection with the installation and servicing of the product, including the furnishing of erection crews, and to cause the doors to be delivered, assembled and installed, and the manufacturer agreed to pay defendants an agreed sum to cover such work and to pay defendants for "the reasonable servicing of such revolving doors until final acceptance thereof."

From the evidence favorable to plaintiff the jury could have found these facts: The manufacturer ships revolving doors from the factory with a moderate setting of tension (85–90 lbs.) on the panic-exit device. The factory setting will take care of normal conditions. If the installer knows there are heavy winds and heavy stack drafts he will take that into account in making the setting when he installs the doors. Load and weather conditions tell the installer whether the tension is set tight enough, or whether the device needs further adjustment. Customarily the installer has to go back to the job and adjust doors after they are installed, depending upon conditions found at the job site, and subject to customers' and *building inspectors' requests. It is the installer's duty* to go back and readjust the pressure according to conditions.

Jesse Curtis, defendants' employee, installed these doors under defendants' supervision. Defendants were familiar with stack draft and wind conditions around City Hall. Many times they discussed these problems with the factory expert who had a file on the building and had visited there dozens of times, and they had discussed them with the assistant engineer at City Hall. Curtis had no knowledge of these wind conditions. Defendants said nothing to Curtis about "bad" wind or "bad" stack draft conditions. . The doors came from the

factory pre-set. Curtis tightened them "according to conditions." He decided what tension the doors should be put on; he set the doors "to the strength of the doors"; he adjusted them according "to the condition of the traffic." He did not, however, take into consideration wind stack or stack draft problems on this job. At trial he said he re-set the tension on installation but did not say at what pressure he set the doors. In his deposition Curtis testified he did not make any setting at time of installation. His employer, defendant Edelman, testified that the factory setting was not changed at time of installation. Edelman acknowledged that the final responsibility was on defendants to adjust the doors "until they are right or until the City, or whoever [they sold] them to, accepts them"; that he was familiar with the "bad" wind and stack draft conditions around City Hall which can cause doors to collapse; that defendants "used the factory setting" of 80–85 lbs., because that setting "should have been ample." Defendants "thought they would hold satisfactorily." Defendant Lyon testified that the doors were set to 80–85 lbs. pressure when received from the factory; that when defendants finished the installation on October 10 the doors were "set to around 85" lbs.; that this is a proper setting for average conditions. He admitted that the conditions around City Hall were not average; that stronger winds are encountered there than in other parts of the city; that he knew the winds were severe there but that defendants "relied on our factory to make the first tension setting"; that defendants "just installed the doors" and left them set at the factory setting "until events proved otherwise," i. e., until the doors collapsed, in which event defendants "would probably investigate it and find out why." The installation was completed on October 9. Curtis instructed the city hall engineer how to operate the doors and make adjustments for tension and release tension. Curtis turned over the keys to the doors to the city's engineer on October 10. The public started using the doors at once.

Between October 10 and 23 defendants received two complaints from city officials that the doors had collapsed. The city was "having trouble" with the wings collapsing under wind pressure. Wind conditions were "bad." During that period defendant Lyon and city officials discussed the trouble the city had with the old doors collapsing because of "terrific wind conditions in that area." Defendant Lyon communicated with the sales manager of the revolving door division of the manufacturer, who knew intimately the conditions that existed at City Hall. They discussed wind and draft conditions. Responding to requests from city officials defendants sent Curtis to City Hall to make adjustments. On his visit October 21 Curtis readjusted and tightened the panic-exit device to a pressure of from 100 to 110 lbs., working on the doors for two hours. Defendant Lyon tested the doors that day and found them set at 100 to 110 lbs., "just about in the middle range of tension."

On October 23 plaintiff, attempting to leave the City Hall, started out the north exit through the revolving doors. There was no one in the revolving door when she stepped in. She put both hands on the crossbar, chest high, and started pushing the door, gently, easily, the door moving slowly. She was walking at a natural gait, moving at a slow rate of speed. After she had gotten a foot to a foot and a half through the door (at least one step after she got in) the door suddenly stopped. Then "the other door from the back came real fast" and hit her on the top of her shoulders and buttocks and threw her head back and forward. In an instant the third door did the same thing, then the fourth door, until three leaves of the door had hit her from behind. She was not thrown to the floor but she was dazed and felt pain.

On October 24, in response to another call from the city, defendants sent Curtis to make a further adjustment. This time the panic-exit device was tightened up to the maximum of the specifications, 180 lbs.

pressure, in accordance with the suggestion of the expert from the factory. After the 180-lb. setting was made there was no further trouble from the collapsing of the wings. On November 8 the city wrote the manufacturer expressing concern that the doors "would not collapse under any condition" after the last increase of tension. A factory representative made an investigation, found the doors adjusted to 160–170 lbs. pressure to withstand heavy draft and wind pressure, but that they could still be collapsed under emergency conditions. He instructed defendants to increase the tension if they found the doors would collapse when the temperature dropped. He believed that the doors, adjusted to 180 lbs. maximum, would withstand most winds and temperatures encountered at City Hall. The city accepted the doors on November 21. Defendant Lyon tightened the doors further on November 30, but still within code requirements.

The sales manager of the revolving door division of the manufacturer gave testimony from which the jury could find that 180 lbs. would be the proper pressure, "the satisfactory setting," for the city hall doors under the conditions existing in the fall of 1957. The doors are not supposed to collapse when a lady is walking through them pushing in a normal manner; they are not supposed to collapse automatically except in a panic. People are supposed to be able to walk through these doors safely without having them swing around and hit them. If the doors collapsed when people walked through them normally, under the setting made on October 21, they were not set right. Assuming they collapsed on October 23 when the setting was 125 to 130 pounds, that setting would be wrong, and a setting of 180 lbs. would be better for safety. The doors "should have been adjusted to hold." If the doors collapsed it had to be because there was more pressure applied than the doors were set for, and if not set at the proper setting for the existing conditions the doors could have collapsed. At 180 lbs. pressure it would be difficult—would

take a lot of force—to put the wings out of radial position.

Appellants'· first point is that the court erred in refusing to direct a verdict for defendants because the panic-exit device was set between 60 and 180 lbs. in accordance with the plans and specifications of the contract under which the revolving doors were installed; that the plans and specifications were not defective; and that the installation of the doors had been completed and control relinquished to the city.

Appellants seek exoneration under the rule that a contractor is entitled to rely upon the plans and specifications and is not liable for injuries due to "defects" in what he constructs unless the plans and specifications are "so apparently and obviously defective as to put a contractor of average skill and ordinary prudence on notice that the work is dangerous and likely to cause injury and that he should not attempt construction according to the plans and specifications." 65 C.J.S. Negligence § 95, p. 613; Ryan v. Feeney & Sheehan Bldg. Co., 239 N.Y. 43, 145 N.E. 321, 41 A.L.R. 1; Romano v. Rossano Const. Co., 341 Mass. 718, 171 N.E.2d 853, 855. Appellants argue that they adhered strictly to the contract, setting the panic-exit device within the 60–180 lb. range as required by the specifications, and that there is nothing to show that defendants knew or should have known that such a setting was dangerous or likely to cause harm. Appellants further argue that there was no duty on defendants to do anything with respect to the doors on October 23; that they had finished the installation, turned over the keys, instructed the city engineer how to adjust and release the tension, made an adjustment on October 21, and were no longer in control of the doors and of the panic-exit device; that the control was in the city, and many people not under defendants' control could operate the doors and the tension-releasing arrow.

██ The rule relied on is inapplicable and appellants' argument is based upon a fundamentally erroneous conception of their duty. There is nothing in the pleadings or evidence to suggest that the minimum and maximum limits of excess pressure specified in the contract were defective, improper or dangerous. On the contrary, the inescapable conclusion to be drawn from the evidence is that limits of 60 to 180 lbs. of excess pressure are the standard limits customarily prescribed. It is undisputed that, depending upon conditions existing at the time of the setting, an optimum setting at any given time could be made within these limits. The simple act of hanging a revolving door unit with a panic-exit device capable of being set to work at from 60 to 180 lbs., pre-set at the factory at 85 lbs., was not the alpha and omega of defendants' duty. Their duty went further. In addition to installing they were required by custom, by their contract with the manufacturer, and under their contract with the city *to service and adjust the tension on the panic-exit device* for both normal and emergency usage, to the satisfaction of the city, under the existing conditions of wind stack draft. It is true that defendants did not have "control" of the doors in the sense of possession of or dominion over the doors, but this is immaterial. An obligation to adjust and service an installation until acceptance by the customer does not require the installer to retain possession, control or dominion over the mechanism. On the date of the accident, October 23, the .city had not accepted the work or paid the bill, and there was no acceptance until November 21. (We do not mean to imply that if the city had accepted, defendants would thereafter be absolved of all claims arising out of negligent installation.) At the time of the accident defendants were under a contractual duty to the city and to the manufacturer, and under a common-law duty to the general public using the revolving doors to exercise ordinary care, to make the adjustments of the panic-exit device reasonably calculated to protect the public from harm in the normal use of the doors.

Appellants' second point is that the court erred in refusing to give Instructions Nos. 4–A and 4–B for the reason that they in-

corporate appellants' theory of defense; that refusal of Nos. 4-A and 4-B necessitated the use of Instruction No. 5, which placed a heavy burden on defendants and denied them the right to rely upon the plans and specifications.

Refused Instruction No. 4-A follows:

"The Court instructs the jury that if you find that the revolving door mentioned in evidence was installed by the defendants and the keys to the door were turned over to a representative of the City of Kansas City, Missouri, after instructions had been given to a representative of the said City as to the operation of the door, and if you further find that the said City commenced to and did permit the public and employees of the City to use the door, and if you find that the door was installed according to the specifications of the City of Kansas City, Missouri, then your verdict shall be for the defendants even though you find and believe the plaintiff was injured."

Given Instruction No. 5 was identical, except for the addition in No. 5 of the words, "and in so doing the defendants exercised ordinary care and were not negligent," immediately preceding the direction of a verdict.

■ Refused Instruction No. 4-A did not submit facts constituting a defense under the facts in evidence. It omits an essential element; the duty to exercise ordinary care to adjust the mechanism after installation. It relates to the performance of a part only of defendants' duties under their contract with the city, does not take into consideration defendants' duty to the public, and does not negative negligence resulting in harm to plaintiff.

■ Refused Instruction No. 4-B follows:

"The Court instructs the jury that if you find and believe from the evidence that the defendants contracted with the City of Kansas City, Missouri, to install the re-volving door referred to in evidence according to specifications furnished by the said Kansas City, Missouri, and if you find said door was installed according to the specifications, then your verdict shall be for the defendants."

4-B adds nothing to 4-A. It submits the undisputed fact that the contract and specifications existed, and resubmits the third finding of 4-A. It was not error to refuse 4-B for the same reasons that it was not error to refuse 4-A. In refusing 4-A and 4-B the court correctly ruled. For all practical purposes they directed a verdict for defendants.

Appellants' third point is that the court erred in giving plaintiff's main verdict-directing Instruction No. 1:

"The Court instructs the jury that if you find and believe from all the evidence in this case that defendants, John Edelman and T. Lowrie Lyon, doing business as Edelman-Lyon Company, installed the revolving doors at the north entrance to the City Hall at or during the times mentioned in evidence and if you further find that the said doors had not been accepted by the City on or before October 23, 1957, if so, and if you further find that the defendants had not set the panic exit device on said doors to a holding power of 180 pounds at or prior to October 23, 1957, if so, and if you further find that the defendants knew or should have known that said doors were likely to collapse and injure persons using said door, if so, under all the circumstances and conditions existing at and around said entranceway, if said panic exit device was not set at the pressure of 180 pounds, if so, and if you further find that the plaintiff was an employee of the City of Kansas City, Missouri, on October 23, 1957, and on said date was walking through said north revolving door in a normal manner, if so, and if you further find that as she was walking through said revolving door said door collapsed and struck her, if so, and if you further find that said doors collapsed

because the panic exit device was not set at 180 pounds pressure, if so, and if you further find that defendants were negligent in so failing to set said panic exit device at 180 pounds pressure, if so, and if you further find that as a direct and proximate result of said negligence, plaintiff was injured, if so, then your verdict must be for plaintiff and against the defendants."

■ Appellants complain that No. 1 ignores the fact that the doors were set in accordance with the specifications. This is true but immaterial. Compliance by defendants with the specifications of the contract was not an essential element of plaintiff's case, which was based on negligent failure to set the panic-exit device at a pressure sufficient to prevent collapse of the doors.

■ Appellants say that No. 1 assumes that the doors would collapse if not set to 180 lbs., but we do not agree. The language does not make that assumption but requires the jury to *find from the evidence* not only defendants' knowledge, actual or constructive, of the likelihood of collapse if the device was not set at 180 lbs. pressure, but also the fact that doors *did* collapse because the device was not set at that pressure.

■ Appellants urge that No. 1 does not specify and hypothesize the "circumstances and conditions existing at and around the entranceway," and therefore gives the jury a roving commission to find for plaintiff if the doors collapsed from causes not connected with defendants' responsibility. The circumstances and conditions there existing included the setting of the panic-exit device and the tensioning arrows, the amount of pressure exerted by the wind and by plaintiff, the sudden stopping of the doors, the nonexistence of other traffic in the doors, temperature, etc. There was no evidence that the doors or tensioning arrows were tampered with. The only evidence on this was that the

arrows were always in proper place. There was no quarrel or dispute as to what circumstances and conditions were relevant factors or what they actually were at the time, hence there was no error in using the general language quoted above.

■ Appellants contend that No. 1 places an absolute duty upon defendants to set the door at 180 lbs. pressure; that this ignores the duty of defendants to the public as a whole to make the doors collapsible so as to allow ready egress in case of a panic. In support appellants cite Trautloff v. Dannen Mills, Inc., Mo.App., 316 S.W.2d 866, condemning an instruction that defendant was "bound to keep its premises * * * in a reasonably safe condition for the use," etc. No. 1 does not use this language or employ this approach. It does not charge that there is an absolute duty on defendants to set the device at 180 lbs. It submits for the consideration of the jury the questions whether the defendants knew or should have known of the likelihood of collapse if not set at 180; whether the doors collapsed because not set at 180, and whether defendants were negligent in not setting it at 180. There was evidence that the doors collapsed before October 21 on a low setting; that they collapsed again on October 21 with a somewhat higher setting but less than 180; that after the doors were set at 180 they did not collapse, and that 180 was the proper and satisfactory setting. No. 1 does not ignore defendants' duty to the public under panic conditions. While the figure 180 is the maximum figure under the specifications, it is yet within the range of permissible adjustment for panic conditions.

■ Appellants maintain that there was no duty to plaintiff unless defendants had control and that No. 1 assumes but does not require a finding that defendants were still in control of the doors at the time of the casualty, citing Tucker v. Taksel, Mo.App., 345 S.W.2d 385, for the proposition that an instruction omitting a requirement of a

finding of control is erroneous. That was a landlord and tenant case in which liability depended upon whether defendant retained control of the premises for the purpose of making repairs. "Control" was used there in the sense of possession or dominion, a type of control not involved here. We are dealing with the performance of the duty of an installing contractor to return to the premises after original installation, and after the facility is placed in use by the public, for the purpose of servicing and making adjustments in the mechanism, adjustments required to be made until final approval and acceptance by the customer. In such case it would be inappropriate to require a finding that defendants had "control" over the doors. The requirement of a finding that the doors were installed by defendants and had not been accepted by the city was enough, without requiring a finding of control.

■ Appellants comment on the failure of No. 1 to submit performance by defendants of a function so inherently dangerous that they should not have undertaken it. No such submission was required. Plaintiff's case was not based on any theory of inherent danger.

■ Appellant's fourth point is that the court erred in its ruling on plaintiff's objection to the following portion of defendants' closing argument to the jury:

"They complain about the setting on this panic exit device, but who set it? It was set by the International Steel Company. As I told you, these gentlemen don't have the equipment or the engineering experience to figure out all these things. They have got that back at International Steel Company, and they have a fellow on it back there, and they set this with the idea in mind of the conditions that were there at the City Hall. If anybody is responsible, International Steel would be responsible, and they aren't here. International Steel would be responsible, and if she doesn't recover in this case she can sue—

"Mr. Yonke: (interrupting) "That is an improper statement of the law, and it is no defense by these defendants, anyway.

"The Court: No, sustained."

We find no error in the ruling. Defendants' argument that the manufacturer, and inferentially *only* the manufacturer, was liable to plaintiff because the manufacturer, through its experts, set the panic device with the conditions at City Hall in mind, ignores the indisputable facts. It fails to recognize that before shipping the doors from the factory the manufacturer adjusted the panic-exit device to a moderate tension within the minimum and maximum limits, not as a final adjustment but as an average setting within the limits prescribed in the specifications, and that it was the duty of the installing contractors to make the more precise and final adjustments required to suit the customer and building inspector, and protect pedestrian traffic in normal operating conditions and public safety in emergency conditions. Under the evidence the argument was not based upon the essential facts and exceeded the wide range and latitude ordinarily afforded counsel in argument.

■ Appellants' fifth point is that the court erred in its ruling on objections to portions of plaintiff's counsel's argument in which, discussing the value of pain, he was permitted to argue that "When you hear someone died, you always say you hope they were fortunate enough that they didn't have much pain, or that they died quickly" and "Pain is such a terrible thing that society invents ways to execute people so they don't have pain." Defendants objected that the latter argument is contrary to law, prejudicial, argumentative and outside the issues of the case, and calculated to arouse the sympathy, passion and prejudices of the jury. We have read the cases cited by appellants but find them different and distinguishable. Although the quoted arguments are extreme and not recommended we do not consider them so far outside the bounds of propriety in portraying human

and social aversion to pain, as a consideration for the jury in determining the monetary worth and value of pain, as to require judicial intervention in this case.

Appellant's sixth and last point is that the verdict is excessive. With slight modification we adopt plaintiff's statement of her injuries and damages.

Plaintiff, 45 years of age, married, with two children, was employed by the city as a clerk at a salary of $220 a month. Immediately following the accident she felt pain in her right knee, right pelvis, left forehead and the back of her head and neck. She was dazed for a second. After 15 minutes or more she walked to a bus stop and caught the bus home. She returned to work the next morning and the second morning. She began seeing double and went to General Hospital. A doctor advised her to see her own physician. She called Dr. Sinclair, who gave her some pills for the pain she was suffering about the back, neck, forehead, left arm and shoulder, and told her to see another doctor. She went to Dr. Pipkin, who took X-rays. He suggested surgery but she did not take his advice. She consulted Dr. Pearl, who sent her to St. Joseph's Hospital a half day for about three weeks for physiotherapy and traction treatment. This gave her temporary relief. Thereafter she consulted Drs. Pucci, Cooper and Feierabend. She began wearing a neck brace; was confined to St. Joseph's Hospital for 13 days in bed traction with a piece of harness under the chin that came up over the head, attached to weights. The doctor fitted up a device so that she could take traction treatments in her home. She was using this device at the time of the trial four and a half years later, every day from two to three hours a day. It helped relieve the pressure and tension. She went to St. Joseph's Hospital for three days for a myelogram, which showed that on the right side between the sixth and seventh cervical vertebra the nerve root appeared to occupy a considerably larger space than on the left side. This was also true to a slightly lesser degree at the interspace between C–5 and C–6. Impression: "Rather minimal defect in the cervical area on the right side between C–6 and C–7 * * * questionable slight irregularity of the interspace above on the same side." After the accident she worked on a part-time basis, half days, until December 26, 1957. She has tried to work at other places but has been unable to do so because of pain and headaches. Dr. Feierabend prescribed a traction and a neck brace like the one she had been using. She wore a collar up to 10 months before the trial (some three and one half years). She wore it when she was out of bed and not using traction. She stopped wearing the collar because it was chafing her skin and causing her more pain. She is able to do light housework but when she tries to iron or sweep or peel vegetables the pain comes back worse into the back of the neck and down into the thumbs. She has a dull aching pain in her head all of the time, and in her neck when she tries to look down. The pain extends down through the arms and into the left hand. The fingers are numb and the thumb has pain.

Before her accident plaintiff was in good health. She worked a great deal in a flower and vegetable garden; did all her own housework; was active in church affairs. Since her accident her husband and children have done most of the housework and laundry. She does not work in the garden anymore.

Dr. Cooper testified he found some limitation of the movement of the neck in all directions. On the left there was a C–7 nerve root hypalgesia (diminution in sensation). The C–7 is the nerve root which arises just at the top of the seventh cervical vertebra, which is the lowest vertebra in the neck. The loss of sensation was sustained within the C–7 nerve root distribution. There was some disfunction of the seventh cervical nerves. This all leads up to a cervical intervertebral disc syndrome; the same as a herniated disc, a protruded disc in the

cervical area. She has suffered a disability of around 30 percent; she has a herniated intervertebral disc. Her clinical symptoms are consistent with that and her condition is permanent. There are two courses of treatment. The conservative, which entails limitation of activities, and surgery. The type of operation necessary for this kind of a case would cause stiffness and loss of motion. He could not guarantee the relief of Mrs. Arnold's symptoms if she underwent surgery.

Dr. Pucci found the following positive conditions: Limitation of neck motion in all directions, especially on turning the head to the left and upon turning or bending the head forward and backward. Tenderness overlying the cervical spine at the level of the fifth and sixth cervical vertebrae; tenderness of the muscles at the back of the neck, especially on the left, tenderness in the left trapezius muscle, and weakness of the left biceps muscle and triceps muscle, which has decreased as compared with the right; loss of sensation in the area supplied by the sixth cervical root on the left; signs of irritation or compression of the sixth cervical root on the left and probably some injury to the brachial plexus on that side. His final diagnosis was a herniated disc between C-6 and C-7 on the left. He put her in a collar and recommended cervical traction and physiotherapy. He saw her again on April 11, 1962. Her complaints and his findings were essentially the same as they had been on all previous examinations. She had some numbness on the left side of the face, a difference of sensation in the left arm as compared with the right. She had some hyperactivity in the deep tendons reflexes at the knee and elbow, which she had had more or less throughout all previous examinations. His diagnosis remains that of irritation of the sixth cervical root on the left, a neuralgia or persistent pain syndrome involving the brachial plexus on the left, and the possibility of a ruptured disc. In his opinion she will always have discomfort and probably would not be able to hold a job. He thought that an attempt at surgi-

cal therapy was justified. Other than surgery there is no treatment he could recommend except traction, physical therapy, muscle relaxation and drugs. In his opinion her condition is permanent. He estimates her disability at about 50 percent of the body as a whole. Her biggest defect was between C-6 and C-7 where the seventh cervical root comes out, but there is also a defect at C-5 and C-6, where the sixth cervical root comes out. She has a persistent neuralgia involving the nerve roots, i. e., the brachial plexus. This would be worse than having a disc. Referring to a report he had previously made he testified "This report says her C-6 nerve root seemed to be better, but on the other hand she was not only having trouble with C-6 but also with C-7; and in addition to that it was the first time I noticed marked hyperactivity of the ankle, * * * I thought the signs not present before were present now. This means that she has more of a neurological deficit in January than on previous occasions." There is likelihood of her having a disc. He explained the term "nucleus pulpous." If a disc protrudes, it may protrude to the side. It can also protrude backwards and press on the spinal cord, so what he was saying, in effect, was that the disc was not only bulging to the left but also bulging backwards against the spinal cord, which was more serious than just having the C-6 involved.

Dr. Feierabend testified that the neck had limitation of rotary movements to the right and left. Referring to the myelogram report he testified this shows an area where there is a break in the column at this level which he would say is suggestive of pressure at this level, which would mean a protruded disc. He could not say it is absolutely certain, but it certainly is suggestive. It may be that she needs surgery. He examined her again on March 20, 1962. He found that she had neck limitation of motion in all directions. She complained of pain in all these motions and their extremes. The left biceps is diminished. There is an inequality of reflexes and that is important.

He found a sensory deficit on the left upper extremity that did not fit any particular pattern. The left hand is 1/4 inch smaller than the right, indicating some atrophy, caused by interference of the nerve supply to the muscles of the hand. Regarding permanency of these injuries he testified, "Yes, it is permanent if they don't do something for her. I think she will have to have some surgery and even then they are not as good as new. There will be some permanency even after the surgery." By permanent he meant for the rest of her life.

From the date of her injury in October, 1957 to the time of her trial, April, 1962 plaintiff had lost four and one-half years' wages at $220.00 a month, or $10,880.00. She had intended to continue working. Her life expectancy was 26.0 years. Assuming that she would have worked for only seven years of that period, she would have earned approximately $18,000 in wages. This would represent a total loss of earnings of nearly $29,000.

The question is whether $30,000 is an excessive award, after reduction from $36,000 by the remittitur ordered below. Numerous cases have been cited to assist us in determining this question.[1] In trying to fit this case into the general pattern of awards for similar injuries under the rule of uniformity of judgments we have close-ly compared Hattie Arnold's case with these and other cases. We have considered her age and life expectancy, the nature, extent, seriousness and disabling characteristics of her injuries in the light most favorable to her. We have weighed the pain and suffering, the treatments she received, the hospital confinement, the experience of the myelogram, the necessary use of appliances and devices, the restriction of her physical activities, the loss of earnings she has sustained, the possibility of future surgery and its prospective result. We have considered the value of the dollar at the time this verdict was rendered, and the fact that an able and experienced trial judge, who saw and heard plaintiff and the medical witnesses testify, reduced the verdict by $6,000 in the exercise of his judgment on the matter of the proper amount to be awarded. Everything considered no further remittitur should be required.

Judgment affirmed.

COIL and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.

1. *Appellants' citations*: Brown v. Payne, Mo.Sup., 264 S.W.2d 341; Rinderknecht v. Thompson, 359 Mo. 21, 220 S.W.2d 69; Schaefer v. Trans-American Freight Lines, Inc., Mo.Sup., 173 S.W.2d 20; Arno v. St. Louis Public Service Co., 356 Mo. 584, 202 S.W.2d 787; Enyart v. Santa Fe Trail Transp. Co., Mo.Sup., 241 S.W.2d 268; Lange v. St. Louis Public Service Co., Mo.Sup., 233 S.W.2d 641; Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856; Baker v. Kansas City Terminal Ry. Co., Mo.Sup., 250 S.W.2d 999; McCaffrey v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W. 2d 361; Miller v. Multiplex Faucet Co., Mo.Sup., 315 S.W.2d 224. *Respondent's citations*: Donahoo v. Illinois Terminal R. Co., Mo.Sup., 300 S.W.2d 461; Pandjiris v. Oliver Cadillac Co., 339 Mo. 726, 98 S.W.2d 969; Easterly v. American Institute of Steel Construction, 349 Mo. 604, 162 S.W.2d 825; Kelly v. Kansas City Public Service Co., Mo.Sup., 335 S. W.2d 159; Hillis v. Home Owners' Loan Corp., 348 Mo. 601, 154 S.W.2d 761; Chambers v. Mo. Pac. R. Co., Mo.Sup., 356 S.W.2d 64.