**R AND O ELEVATOR COMPANY, Inc.,**
a corporation, Plaintiff,
and
**S. J. D., Inc., et al., Additional Parties**
Plaintiff,
v.
**BITUMINOUS CASUALTY CORPORA-**
**TION, a corporation, Defendant.**
*No. 4-59 Civ. 178.*

United States District Court
D. Minnesota,
Fourth Division.
June 21, 1960.

The plaintiff, R and O Elevator Company, Inc., hereinafter referred to as R and O, brings this action against the Bituminous Casualty Corporation, an insurance company, seeking a declaratory judgment with respect to its rights and liabilities under a certain insurance policy.

O. A. Brecke and J. Robert Nygren, Minneapolis, Minn., for plaintiff.

Maugridge S. Robb, of Robb, Robb & Van Eps, Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

It has been alleged in the complaint and established at the trial herein that the Kasota Office Building in downtown Minneapolis is owned by S. J. D., Inc., a party plaintiff impleaded by the defendant insurance company, hereafter referred to as Bituminous. That building had two elevators, one freight and one passenger. On October 14, 1958, the passenger elevator, while in motion on one of the upper floors, suddenly plunged to the basement, thereby causing the passengers riding within to sustain severe bodily injuries. They have brought suits for damages in a Minnesota State Court against S. J. D., Inc., the claims all being drafted in the same form. They allege that S. J. D., Inc., through the negligence and carelessness of its employees in the operation and maintenance of its elevator service, should be held accountable for the injuries resulting therefrom. The total amount sought by the passengers is in excess of $400,000. In those actions, S. J. D., Inc., has impleaded R and O as an indemnifying third-party defendant by reason of the fact that, as the third-party complaints allege, it had "agreed to examine, adjust, clean and lubricate said passenger elevator in the Kasota Building and to advise [S. J. D., Inc.] of any repairs or replacement of parts that appeared to be necessary." It was further alleged that R and O's negligence and carelessness in its Kasota Building operation and in failing to inform S. J. D. of the elevator's need for repairs and replacement of parts proximately caused the accident. In its answers, R and O generally denied the allegations of the third-party complaints and further averred that it was the negligence of S. J. D. in operating the elevator which caused the accident. The State Court actions have not yet been brought to trial.

Prior to the accident, R and O had agreed to make an "oil and grease inspection and service" of the two elevators. The agreement further reads:

"Under this agreement we will make examinations, adjustments and necessary cleaning and lubricating of the elevator once per month. We will furnish lubricants and cleaning material. Work to be done during regular working hours of regular working day of the trade.

"We will advise you if any repairs or replacement of parts are necessary, and at no time will we do any of this work on your elevator without your permission."

In consideration for the above services to be rendered by R and O, S. J. D. agreed to pay $16.50 for each monthly servicing operation.

Pursuant to the elevator maintenance contract, the elevators were serviced by R and O employees once during each of the months of June, July and August of 1958, those being the months immediately following the signing of the agreement. On September 29, 1958, about two weeks before the accident, Harry Olund, an R and O serviceman, serviced the elevator. Although the records of that inspection were subsequently destroyed in a highway accident there is testimony that that inspection and lubrication took about one hour to accomplish, that being the average duration of other similar operations at that building. Olund made no recommendations to S. J. D. pertaining to extra service or replacement of parts. S. J. D. in impleading R and O does not contend that R and O replaced any parts or made any repairs to the elevator in question under the maintenance contract.

At the time of the accident, R and O held insurance issued by Bituminous. The insurance policy in question covers the period from October 1, 1958, to October 1, 1959, within which the accident occurred. It is entitled a "Comprehensive Liability Policy." The business of the insured is stated as "manufacture, install and service elevators." Some of the pertinent provisions of the policy are set forth below:

"Bituminous Casualty Corporation * * * Agrees with the insured,

\*   \*   \*   \*   \*   \*   .

"I. Coverage A—Bodily Injury Liability: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident." (Coverages B and C relate to liability with respect to automobile and property damage and are not pertinent herein.)

"II. Defense, Settlement, Supplementary Payments: With respect to such insurance as is afforded by this policy, the company shall:

"(a) defend any suit against the insured alleging such injury, \*  \*."

"Conditions

"3. Definitions:

"(a) Contract. The word 'contract' means, if in writing, a lease of premises, easement agreement, agreement required by municipal ordinance, sidetrack agreement, or elevator or escalator maintenance agreement.

\*   \*   \*   \*   \*   \*

"(g) Products Hazard. The term 'products hazard' means

"(1) goods or products manufactured  \*  \*  \*;

"(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: \*  \*  \* (d) operations for which the classification stated in division (a) of the declarations specifically includes completed operations."

By endorsement, it was agreed between Bituminous and its insured, R and O, that "the policy does not apply to the products hazard as defined therein."

The premium to be paid in consideration for the insurance coverage was based, at least in part, upon wages paid by R and O. On separate attached forms entitled "Declarations, Description of Hazards," reference is made to various categories of R and O's employees by function, such as "Elevator Erection or Repair," "Elevator or Escalator Mfg.", "Clerical Office Employees," etc. These classes of employees are further broken down into the States where R and O operates its business. The total wages paid to each subcategory are multiplied by stated numerical figures to determine the premiums to be paid on the various hazards, including "Elevator Erection or Repair." Other bases for determining the premium are the number and type of automobiles and trucks used by R and O and the cost of its construction projects.

■ The position of Bituminous is that there is no insurance coverage under this policy for any negligence of R and O in the performance of its maintenance contract with S. J. D. by reason of an endorsement on the policy excluding coverage of "Products Hazard". The insurance company contends that any service by way of maintenance of this elevator by the insured was completed when R and O's employees concluded their servicing of the elevator each month. Hence, it is urged that there were completed operations as defined under the "Products Hazard" provision, and no insurance coverage continued after the men left the job on any maintenance assignment by reason of the express endorsement that the policy did not apply to "Products Hazard". Bituminous admits that the policy provided coverage for any negligent acts of R and O employees during the period that its maintenance employees were actually servicing the elevator. But its position is that coverage ceased as soon as the employees took up their tools and left. However, it would seem that the fact that

there is no coverage under the "Products Hazard" clause would not warrant the conclusion that the coverage of this policy should be so drastically limited as Bituminous contends. There are no provisions in the policy which suggest such limited coverage and where we have a comprehensive liability policy that is a classic example of an abstruse insurance contract, with its many conditions, exclusions and endorsements, any doubts as to the coverage should be construed against the insurer. Ocean Accident & Guarantee Corp. v. Aconomy Erectors, Inc., 7 Cir., 1955, 224 F.2d 242.

■■ Maintenance of elevators was one of the primary business pursuits of the insured, and clearly it was one of the business activities that the agreement of insurance purported to cover. In the maintenance of this elevator, R and O did not sell any products to S. J. D. Maintenance of elevators must be distinguished from the business of selling elevators or installing parts in elevators. The negligent conduct upon which liability is claimed in the State Court suit is R and O's alleged failure to properly inspect and lubricate the elevator and its alleged failure to notify the owners of the need for elevator repair and replacement of elevator parts. In discussing the effect of "exclusion of products liability" in an insurance policy, Judge Goodrich, of the Third Circuit, stated in Liberty Mutual Ins. Co. v. Hercules Powder Co., 224 F.2d 293, 295, 54 A.L.R.2d 513, 517,

"Does this language let Liberty out? It is of significance, we think, that argument for Liberty has pointed out the origin of what is now called 'Products Liability.' It comes, we are told, from the famous opinion by Judge Cardozo in MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696. The dispute there concerned the liability of a manufacturer for personal injuries resulting from a defect in the product to one not in privity of contract with the manufacturer. The case marked

an advance in Tort law and the extension of liability to manufacturers was carried to suppliers of chattels as well. See Restatement, Torts, §§ 388 to 393. The very basis of this liability was the responsibility put upon one who sends goods out into the channels of trade for use by others. To the extent that the history of 'products lability' is any criterion it is clear that it has no place with regard to a piece of equipment sent by a manufacturer to a laboratory for processing."

And to paraphrase his language we may say that, to the extent the history of products liability is any criterion, it is clear that it has no place with regard to the services rendered and the failure of this insured to exercise ordinary due care in the inspection of a passenger elevator.

It may be noted that where the policy refers to the description of hazards, entitled "Products (Including Completed Operations)," as set forth in Schedule No. 1, it will be observed that premiums on products hazards are to be computed on sales—obviously sales of products—not sale of service, which is here involved. R and O furnished no products to the elevator from which negligence is predicated.

That the parties to the insurance contract intended that coverage should be afforded if any negligence of R and O's employees proximately caused this elevator accident, seems evident from the impelling inference which may be drawn from the first paragraph, (a), in the printed portion under "Exclusions", which reads:

"This policy does not apply:

"(a) to liability assumed by the insured under any contract or agreement except under coverages A and C, (1) a contract as defined herein or (2) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products."

Although this paragraph is not a model of clarity by reason of inadequate punctuation, it must be recognized that it is intended that contract coverage is afforded under coverages A and C of the policy. When we turn to the definition of "Contract" as defined in the printed portion of the policy, we find that it specifically includes "elevator or escalator maintenance agreement."

The liability of R and O in the State Court action is based upon its failure to exercise due care in carrying out its elevator maintenance agreement with the owners of the elevator. And, as noted above, in the typewritten Declarations, Description of Hazards, Schedule No. 2, the hazard of elevator repair is included. The insurer's position that merely because insurance coverage is extended to completed operations under the "Products Hazard" provision, no coverage exists under other provisions in the policy for so-called completed operations for the reason that "Products Hazard" coverage is excluded by an endorsement, does not seem tenable, first, because the operation upon which negligence is predicated herein was not an operation connected with products, and second, no such limitation can be spelled out of the insurance agreement under the description of the hazards "Elevator Erection or Repair" included in the insurance coverage and as to which risk premiums were paid. If the term "operations" under the "Products Hazard" provision can be construed to mean all operations whether connected with products or not, then reference may be made to the language under the word "operations" where it is provided that

"* * * the following shall not be deemed to be 'operations' within the meaning of this paragraph: * * * (d) operations for which the classification stated in division (a) of the declarations specifically includes completed operations."

We turn to Schedule No. 1 of the Declarations, and Paragraph (a) refers to Schedule No. 2, where among the description of hazards "Elevator Erection or Repair" is listed. It is true that there is no specific language which indicates that elevator repair specifically includes "Completed Operations." But it is to be doubted that under a maintenance contract requiring inspection from month to month, with the alleged accompanying duty to notify the owners of the elevator of any need for repair, the responsibilities and duties of R and O under its maintenance contract at any time were "completed" as that term is used in connection with "Products Hazard" or otherwise. The alleged duty to advise the owners of the elevator of the need for repairs, if that duty existed, was continuous. *It never ended merely because the workmen physically left the job.* In any event, where the policy specifically recognizes contract coverage under A and C, as defined in the policy, and where the definition of contract specifically includes "elevator maintenance", there is implicit in the coverage any negligent acts involved here which may have taken place by reason of R and O's failure to comply with its duties under the contract of elevator maintenance entered into between it and the Building Company.

Certain language of the court in Hercules Co. v. Royal Indemnity Company, D.C.S.D.N.Y.1959, 171 F.Supp. 746, is particularly pertinent here. In that case the insured was engaged in doing certain work in cleaning out the hold of a ship, and in doing so certain rags were negligently left which fouled the bilge suction valves and caused damage. An action was brought against the plaintiff and the insurance company refused to defend. It appears that the company had issued a comprehensive general liability policy to the plaintiff. Although certain provisions in the policy differed from the one now under consideration, it would appear that the products hazard exclusion provision was substantially the same. The court stated, at page 748,

"The defendant maintains the insurance policy excluded claims arising from 'completed work.' The defendant relies upon two provisions of the insurance policy in support of this contention. One is that on the

face of the policy there was the phrase 'Products (Including Completed operations) Excluded.' There is no doubt from this provision of the policy that the insurance did not cover *products*. However, plaintiff did not sell products; it performed services. The exclusion of a products liability, the premium for which under the policy would have been a certain percentage of sales, would certainly not have indicated to the average purchaser of insurance that there was an exclusion for liability for negligence in connection with services rendered by it. The claim of the Weyerhaeuser Steamship Company was not for negligence in connection with products sold by the plaintiff, but rather was concerned with negligence in connection with work done by the plaintiff in connection with services rendered in the cleaning out of the hold of the ship which was an item specifically covered by the policy. The exclusion which relates to 'products' manufactured or distributed by the insured, would not be an exclusion which would relate to services performed, out of which services the accident arose. No businessman reading this policy could reasonably assume from the rather ambiguous language used therein that the insured was not protected against the natural consequence of any negligence on its part in the performance of its services which constituted its regular business. If there is any ambiguity in the policy it must be construed against the insurance company."

And for an exhaustive consideration of substantially the same question presented here, see Nielson v. Travelers Indemnity Company, D.C., 174 F.Supp. 648.

*Defendant cites Lyman Lumber & Coal Co. v. Travelers Insurance Company*, 206 Minn. 494, 289 N.W. 40, and *Hutchinson Gas Co. v. Phoenix Indemnity Co.*, 206 Minn. 257, 288 N.W. 847, but the teachings of neither of these cases are persuasive here. The exclusionary clauses of

each of the policies considered there are readily distinguishable from the policy issued by Bituminous.

It follows from the foregoing that the Court concludes that the plaintiff is entitled to an order declaring the rights and liabilities of plaintiff and defendant under the terms of the policy issued by defendant as prayed for in the complaint.

Findings of fact and conclusions of law may be presented upon ten days' notice.