Hattie ARNOLD, Respondent,

v.

John H. EDELMAN and T. Lowrie Lyon, a Partnership, d/b/a Edelman-Lyon Company, Respondents-Appellants,

Lumbermens Mutual Casualty Company, Garnishee-Appellant.

No. 50962.

Supreme Court of Missouri, Division No. 1.

July 12, 1965.

Albert J. Yonke, Kansas City, for respondent.

Lane D. Bauer, Mari W. Privette, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, for respondents-appellants Edelman-Lyon.

Roy F. Carter, Kansas City, Sprinkle, Carter, Sprinkle & Larson, of counsel, for garnishee-appellant.

HIGGINS, Commissioner.

Hattie Arnold recovered judgment against Lumbermens Mutual Casualty Company, garnishee, in sum $33,881.01, and garnishee has appealed. Edelman-Lyon has appealed from that portion of the judgment denying them attorneys' fees from garnishee.

Prior to this garnishment proceeding, Hattie Arnold sued Edelman-Lyon for negligent failure to make proper setting of the panic exit device on revolving doors installed by them for the City of Kansas City, Missouri, and obtained judgment for $30,000 damages which was affirmed on appeal. Arnold v. Edelman, Mo., 375 S.W.2d 167.

It was admitted that garnishee issued the insurance policy in evidence covering Edelman-Lyon, but garnishee denied liability under a products hazard exclusion endorsement alleging that the construction, erection, and installation of the revolving doors had been completed and possession relinquished to the City of Kansas City before plaintiff's injury, and that coverage did not extend to Edelman-Lyon at such time. Upon trial before a jury all the evidence came from plaintiff and it included the transcript on appeal in Arnold v. Edelman, supra, and the contracts between Edelman-Lyon and the door manufacturer and between Edelman-Lyon and Kansas City.

Walter D. Myers, a professional engineer and assistant city engineer, testified that he was in charge of the city hall where the revolving doors were installed. Plans and specifications for repairing revolving doors in the city hall were written under his supervision. He certified that the job was completed November 21, 1957, and that he then accepted the job on behalf of the City and approved the October 8, 1957, invoice of Edelman-Lyon for payment. The invoice was paid December 16, 1957. The injury to Mrs. Arnold occurred October 23, 1957, and prior to that date the witness had received complaints about the doors collapsing. Upon receipt of such complaints he called Edelman-Lyon to make adjustments which was part of the understanding under the contract. On December 10, 1957, Lowrie Lyon of Edelman-Lyon advised him by

note that "The revolving door wings are holding in this wind which is as strong as I have ever seen it. The guard in the lobby tells me that the wings haven't collapsed since I tightened them November 30; however, they are still within code requirements." There were no payments for the adjustments other than the contract price, it being intended that adjustments would be made until acceptance of the doors. Correspondence between the manufacturer and Mr. Myers showed that the writer, Ray Goad, a Mr. Graves, and Edelman and Lyon inspected the doors November 21, 1957, at which time the doors had been adjusted to withstand draft and wind pressures but would still collapse under emergency conditions. This was after Edelman-Lyon increased the tension on the panic exit device following Mrs. Arnold's incident of October 23, 1957.

Mr. Myers also identified the scope of the work to be done by Edelman-Lyon as consisting of "furnishing all labor, tools, equipment, and supplies and performing all work necessary for and incidental to replace the north and south revolving doors with new ones and related mechanisms," and he considered the duty of adjusting the doors to come within that scope, and that "we expect the contractor to come back and make final adjustments before any job is accepted." The contract agreement stated: " 'To Complete the Work' shall mean that all work required is complete and ready for final acceptance;" and, by reference the contract contained standard General Provisions of Contract applicable to all Kansas City contracts which stated: "Until work is accepted by the Director of Public Works, it shall be in the custody and under the charge and care of the contractor." The contract also contained a certificate from Lumbermens Mutual Casualty Company to the City showing, among other things, that Edelman-Lyon had "Contractors' Bodily Injury Liability $100,000/$300,000" in connection with "Replacement and overhauling of revolving doors" at the City Hall in Kansas City, Missouri.

The work was begun by Edelman-Lyon September 25, 1957, and the doors were in place for use October 9, 1957, but not accepted by the City until November 21, 1957. Edelman-Lyon adjusted the panic exit device on October 21, October 24, and October 30, 1957, and, in addition, tests were made on the doors November 21, 1957, by Mr. Goad, on which occasions the door was out of service. The City considered the adjustments as part of the installation because "we consider a job not fully installed until accepted by the City."

Ray C. Goad testified that he was in the revolving door division of International Steel Company when the doors in question were supplied by that company for installation by Edelman-Lyon. He was in Kansas City November 21, 1957, to test these doors. He stated that upon call from a customer the installer returns to the job and makes adjustments of the door's panic exit device. "(I)f he doesn't he doesn't get paid. * * * it is part of the job of installing the door and completing the installation." Under the arrangement between Edelman-Lyon and the manufacturer it was also anticipated that Edelman-Lyon would continue servicing a door until final acceptance by the customer. "In the case of this particular job they would have to adjust it to suit the job's conditions as they found them." He indicated that the adjustments cannot be made until after the door is in place for some time, and that this was true of this job because there were problems in the city hall due to "stack draft" which is a pressure encountered in tall buildings caused by the rise of heated air leaving a minus pressure around doors at ground level. The necessary servicing is a duty of the contractor until final acceptance by the customer.

John H. Edelman of Edelman-Lyon went with Mr. Goad to inspect the job November 21, 1957. He also testified that he generally installs the doors with the panic exit device at its factory setting, and that they adjust the device to meet the conditions of the job. "Your aim is the lowest setting

that is correct for the job to hold it, and this is a necessary part of finishing it up." The Edelman-Lyon payroll record showed that they had four people on the job from "10/4 to 10/10"; that they sent Jesse Curtis, a mechanic, to the job on October 21, 1957; that they sent Curtis to the job again on October 24, 1957, after a complaint October 21 of the doors collapsing and the injury October 23 to Mrs. Arnold; that they would not have sent Curtis there if the door had been adjusted satisfactorily; that all these items were a part of the job and under the lump sum contract payment. His experience was that ten to fifteen per cent of the doors required adjustments from factory settings on the panic exit device; that no extra charges were made for the adjustments, and responsibility was on his company until final acceptance by the City. He did not consider the job complete until adjustments were made and final acceptance by the City occurred. Lumbermens Mutual examined the contract with the City in order to provide Edelman-Lyon with the coverage required by the contract. Mr. Edelman and Mr. Lyon went to the job site October 23, 1957, when Mrs. Arnold was injured.

Hugh Dayton, a licensed architect familiar with construction in Kansas City, testified that adjusting and testing of the panic exit device is a necessary and incidental part of the installation of revolving doors, and that it is necessary for the installer to return and make the adjustment after the doors have been put in place "because you can't always on the first adjustments come up with the right answer. It has to be tested a number of times, quite often, very often."

T. L. Lyon of Edelman-Lyon testified that he supervised this particular job with the actual work being done by Jesse Curtis and Paul Williams. Their first work was done August 27, 1957, and the major portion of the work was installed by October 9, 1957, at which time door keys were given to the City. After October 9 Curtis was sent to the job to check and adjust the doors. He described the operation: "(T)he tensioning device which held the wings in radial position was adjustable and by tightening the spring tension on the device, both on the top and bottom hinges, you can increase the amount of tension which holds the wings in radial position. You remove the inspection plates on each wing at top and bottom hinge, tighten up the tension devices, and then put the inspection plates back on the doors. * * *

"Q. How do you determine what adjustments have to be made after the doors are put in the aperture? A. By the actual conditions, actual experience, you might say. Q. Do you return when the customer calls and tells you his problem, that the doors aren't operating properly? * * * A. Yes, we do that."

They had a workman on the job October 21, 1957, as a result of a complaint call from Mr. Myers, and after Mrs. Arnold's injury on October 23, "we sent our workman back and told him to tighten up the panic exit devices so that they wouldn't collapse except in accordance with the specifications. * * * That was done on October 24, 1957." On November 21, 1957, he, Mr. Edelman, and Mr. Goad made further inspection and testing of the doors to see if they would release, and on November 30, 1957, he tightened the panic exit device. The adjustments of October 21, October 24, November 21, and November 30, 1957, were made as part of the contract price, and the work then done was necessary and incidental to the installation of the revolving doors. The invoice for collection of the contract price was sent before final acceptance so that payment could be received as soon as possible in view of the thirty to sixty-day average time for an invoice to be processed for payment by Kansas City. He did not consider his job completed on October 23, 1957.

The transcript on appeal in Arnold v. Edelman, supra, showed that plaintiff's verdict-directing instruction required a finding by the jury that "the said doors had not been

accepted by the City on or before October 23, 1957, * * *." 375 S.W.2d l. c. 173 [4].

At the conclusion of plaintiff's evidence, which was all the evidence in the case except on the matter of defendants' attorneys' fees, all parties offered motions for directed verdict. Plaintiff's motion was sustained; those of defendants and garnishee were overruled.

Garnishee's point on appeal is that "The Court Erred in Overruling Garnishee's Motion for Directed Verdict Because under the Evidence the Plaintiff Did Not Make a Case Against the Garnishee under the Insurance Policy Issued by It Because Liability for Plaintiff's Injury Is Specifically Not Covered by the Exclusion of 'Products Hazard' Coverage." In arguing its point garnishee concludes with a contention that "The evidence in the instant case shows that both the product (the revolving door) had been relinquished to the City and the operations (the installation of said door) had been completed and that the accident occurred away from premises owned, rented or controlled by the insured and is thus, squarely within the exclusionary clause. For this reason garnishee's Motion for Directed Verdict should have been sustained * * *."

The insurance policy admittedly in force at all times material to this case was a comprehensive general liability policy by which garnishee agreed "To pay on behalf of the insured (Edelman-Lyon Co.) all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident." The schedule of coverage showed: "(D) Products (Including Completed Operations) Coverage Excluded, See Endt. 1." An endorsement styled "Exclusion of Products Hazard" read: "It is agreed that the policy does not apply to the products hazard as defined therein." That definition appears under the policy section headed "Conditions":

"(c) Products Hazard. The term 'products hazard' means

"(1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division (A) of the declarations excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

"(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in division (A) of the declarations specifically includes completed operations."

Similar provisions have been before Missouri courts in two previous cases. A virtually identical products hazard provision was held to be misleading and ambiguous and therefore to be construed most

favorably to the insured in Rafiner Elevator Works, Inc. v. Michigan Mutual Liability Co., Mo., 51,267, 392 S.W.2d 240, decided this date; and in Kissel v. Aetna Casualty and Surety Co., Mo.App., 380 S.W.2d 497, 506 [1], the products hazard exclusion was held to have no application on the theory that no product was involved in the insured's business of dirt moving. Although helpful, neither of those cases presented the same situation we have here.

In view of the vagueness and ambiguity in the products hazard provision as indicated by Rafiner Elevator Works, Inc. v. Michigan Mutual Liability Co., supra, and, moreover, where such provisions are used to narrow, cut down, or restrict comprehensive general liability coverage already granted, a good case for coverage might be grounded on the theory of resolving all such ambiguities in favor of broad general coverage. Utchen v. American Casualty Co., Mo.App., 356 S.W.2d 102. See for examples, Heyward v. American Casualty Co., D.C.S.C., 129 F.Supp. 4; McNally v. American States Insurance Co., 6 Cir., 308 F.2d 438; Nielson v. Travelers Indemnity Co., D.C.Iowa, 174 F.Supp. 648; Kendrick v. Mason, 234 La. 271, 99 So.2d 108; McAllister v. Century Indemnity Co., 11 N.J. 611, 94 A.2d 345; Maretti v. Midland National Insurance Co., 42 Ill.App.2d 17, 190 N.E.2d 597; Bituminous Casualty Corp. v. R & O Elevator Co., 8 Cir, 293 F.2d 179, affirming 194 F.Supp. 452. In our view of this case, however, we assume without deciding that the revolving door was a "product" and its installation an "operation," because the facts show as a matter of law that the job undertaken by the insured was not completed and therefore the exclusionary clause would not operate to eliminate coverage.

The evidence in this case is undisputed and, under the evidence, the job contracted by Edelman-Lyon for Kansas City was not complete on October 23, 1957, the date of plaintiff's injury. None of the parties or witnesses considered the door installation complete until it was accepted by Kansas City on November 21, 1957. All of the evidence showed that adjusting the panic exit device and testing the collapsing feature of the wings was an essential part of the contract and work, and the job could not be accepted until this was accomplished. The evidence showed also that the adjustments and testing required for the completion of such a job cannot be done until after the door is placed in position and used under the conditions existing where it is installed. Under the contract governing this job all work was under the custody, charge, and care of Edelman-Lyon until acceptance by the City. Even though the door was installed in the building, the job could be found to be complete only upon final acceptance by the City which could not occur prior to adjustment and testing of the door which did not occur until after plaintiff's injury.

A number of cases from other jurisdictions support the view that we have taken of this case. Representative is Daniel v. New Amsterdam Casualty Co., 221 N.C. 75, 18 S.E.2d 819, in which a plumbing company was to disconnect a hot water heater and remodel it for a room heater. When the plumber sealed the jacket he left some water inside which turned to steam when the heater was fired, causing the heater to explode at sometime following installation. The insurance company resisted the action on the strength of a products hazard clause. On the matter of completion the court said, "We do not consider that the work is complete within the meaning of the insurance contract so long as the workman has omitted or altogether failed to perform some substantial requirement essential to its functioning, the performance of which the owner still has a contractual right to demand." 18 S.E.2d 1. c. 820 [3]. Garnishee would discount this holding on the theory in Baker v. Maryland Casualty Co., 73 R.I. 411, 56 A.2d 920, that whether the work had been completed to the satisfaction of the customer was of no importance. Even so, that court did recognize the question wheth-

er the contractor had actually discontinued all further operations on the customer's premises, and application of that test alone to the facts of our case leads to the conclusion that Edelman-Lyon had not discontinued operations as of the date of Mrs. Arnold's injury. Garnishee also points to the rejection of the holding in Daniel v. New Amsterdam Casualty Co., supra, in Foster Trailer Co. v. United States Fidelity and Guaranty Co., 190 Tenn. 181, 228 S.W. 2d 107. There, a city contracted for repairs to a truck but took the truck from the contractor prior to completion and undertook to complete the repairs itself. Its improper repair resulted in injury to an employee. The court held that no repair operation by the insured was in progress because insured lost control of the work and therefore no liability attached under the policy. We do not see any inconsistency as urged by garnishee because it is obvious that the city relieved the contractor of any further repair operation, while in our case the installation operation continued through the time required for adjustment, testing, and ultimate acceptance.

Significant also is Heyward v. American Casualty Co., supra, cited with approval in Rafiner Elevator Works, Inc. v. Michigan Mutual Liability Co., supra. There the contractor had finished installing a gas line to apartment 14E but work remained in respect to other units of the housing authority. 14E was rented before completion of the entire authority and an injury occurred to an occupant of 14E. Against the contention of the insurer that the work on the 14E gas line was completed, the court held that where there was one contract for the entire project the insurer would not be permitted to amend its policy to cause the exclusion clause to read "if the accident * * * takes place after any portion or part of such operations have been completed or abandoned." Appropriate to our case, the court said: "In the present case there is no showing that the entire work which plaintiff had contracted to do had been completed, nor is there any showing

that the same had been accepted by the owner or that the plaintiff had been paid for the same." 129 F.Supp. l. c. 11 [9]. That court also said, "Even if the policy in question did not cover plaintiff's operations after the same had been completed, as contended * * *, the defendant is not entitled to summary judgment for the reason that the record does not show that the entire work plaintiff had agreed to perform had been completed." 129 F.Supp. l. c. 10 [9]. Our case more strongly favors coverage because the undisputed evidence shows that the contracted installation had not been completed, whereas in the cited case the gas line installation was complete as to unit 14E.

General Cas. Co. of Wisconsin v. Larson, 8 Cir., 196 F.2d 170, also presented a situation akin to our case. Larson was employed to clean a furnace in connection with the installation and servicing of an oil burner. A connection between the door and burner was improperly made, oil leaked from it and a fire resulted after the cleaning but prior to inspection. As in our case, neither the customer nor the contractor considered the work completed. The insurance company relied on a products hazard exclusion defense which was rejected, the court saying, "The work done by him (Strand) was only a part of the job undertaken by Larson; and until Larson performed the part of the work to be done by him the job was not 'completed.'" 196 F.2d l. c. 174 [6].

In addition to those cases previously discussed garnishee has cited other cases which it contends support its position. In Standard Accident Ins. Co. v. Roberts, 8 Cir., 132 F.2d 794, Roberts sold and installed a gas operated refrigerator. Following installation gas escaped and injured the customer's family. The case is distinguished on its facts because the installation had been completed and accepted by the customer. No further operations remained as they did under our insured's contract with Kansas City. A salesman in U. S. Sanitary Specialties Corp. v. Globe Indem-

nity Co., 7 Cir., 204 F.2d 774, placed wax on a courthouse floor for a demonstration and a lady fell on the spot and was injured. The court reasoned that when the wax was placed on the floor the operation, i. e., the demonstration, was completed. There was no contract to remove the wax or perform other operations and the ruling is therefore consistent with our case.

In similar ways other cases cited by garnishee are not in point because the product in each case had been installed, all operations completed, and the job accepted by the owners. In New Amsterdam Casualty Co. v. Ellzey, 5 Cir., 240 F.2d 618, it was stipulated that installation of the window fan involved had been completed. Operations were completed in Kelly-Dempsey & Co. v. Century Indemnity Co., 10 Cir., 77 F.2d 85, where a dynamite cap exploded after the contractor had finished construction of a pipeline and had surrendered possession and control to the owner. Likewise, in Pan American Insurance Co. v. Cooper Butane Co., 157 Tex. 102, 300 S.W.2d 651, the court found that the work of replacing a leaky filter valve and filling a butane tank had been completed prior to an accident to persons working in a cistern who inhaled gas fumes which settled there before the repair was made. The case was distinguished from Lloyds Casualty Insurer v. McCrary, 149 Tex. 172, 229 S.W.2d 605, where the insured installed a gas system and left the premises knowing of a defective pressure gauge and with intent to return and repair the gauge. As in our case, the court held that the operation of installing the gas system was not completed and the insurer was liable on its policy. Berger Bros. Electric Motors v. New Amsterdam Casualty Co., 293 N.Y. 523, 58 N.E.2d 717, involved an accident due to defective workmanship in the installation of hatchery equipment, but it occurred after the installation was completed and the insurer was held not to be liable under its completed operations exclusion. In Crook v. Kalamazoo Sales and Service, 82 R.I. 387, 110 A.2d 266, the obvious distinction from our case is that the hazards exclusion contained a standard for determining an operation to be complete, in that "The occupancy of any portion of a building, or the use of any equipment or construction project for its intended purpose, shall be proof of the completion of such portion, equipment or project." 110 A.2d l. c. 268. In Butler v. United States Fidelity & Guaranty Co., 197 Tenn. 614, 277 S.W.2d 348, 350, 351, "(t)he declaration * * * alleges that the repairs which had already been completed were negligently made." Obviously the injury did not occur while work was being performed. In Baker v. Maryland Cas. Co., supra, insured cleaned a cesspool, poured acid into it, replaced its cover, and left the premises, considering the work completed. The customer sustained injury which resulted from negligent and careless replacement of the cesspool cover. In holding the operation completed the court said, "There can be no question that plaintiff *abandoned* operations on the * * * premises after she had satisfied herself * * * that no further operations on her part were required to complete the work which she had contracted to do * * *. The evidence * * * is undisputed. An accident occurring after that date would therefore not fall within the * * * contract of insurance." 56 A.2d l. c. 922. This, too, is consistent with our case. Finally, garnishee cites Clauss v. American Insurance Co., D.C.Pa., 214 F.Supp. 442, where operations were held completed when an accident occurred to a motorist driving on a boulevard at a point where plaintiff had crossed it in constructing a sewer. The policy defense was proper because the work had been accepted by the city prior to the accident.

As previously indicated, we reject garnishee's contention and conclude that plaintiff did make a case against garnishee because the undisputed evidence shows that the job of installing, adjusting and testing the revolving door was an incomplete operation at the time of plaintiff's accident, and the products hazard exclusion was therefore inoperative.

In respect to insured's claim for attorneys' fees, additional facts are pertinent. The original litigation, Arnold v. Edelman, supra, was defended and appealed by Lumbermens Mutual Casualty Company under nonwaiver agreements made with the insured, Edelman-Lyon. While the appeal was pending plaintiff commenced this action. Garnishee, in its answers to interrogatories exhibited by plaintiff, denied responsibility for the judgment against Edelman-Lyon in a manner contemplated by the agreements. Edelman-Lyon employed counsel and filed a denial of garnishee's answer and asked for an adjudication that garnishee be held liable to plaintiff to the extent of the judgment and for attorney fees in connection with the garnishment proceeding. The trial court denied the request for attorneys' fees and in seeking review of the denial Edelman-Lyon requests additional fees in connection with this appeal.

In seeking attorneys' fees Edelman-Lyon has not made any charges of bad faith; it does not rely on any contract or statute; there is no provision for attorneys' fees in the insurance policy; and application of the "vexatious delay" statute, Section 375.420, RSMo 1959, V.A.M.S., is specifically denied. It is claimed only that garnishee's resistance of the garnishment was a breach of contract resulting in damage to the insured to the extent of attorneys' fees in connection with the garnishment in which the insured was otherwise successful.

The rule at common law in actions at law is that " * * * the successful party is only entitled to recover his taxable costs, in which the fees he pays counsel are not included. 'In general,' says Sedgwick, 'the law considers the taxed costs as the only damages which the party sustains by the defense of the suit against him, and these he recovers by the judgment in his favor.' " St. Louis R. Co. v. Southern Ry. Co., 138 Mo. 591, 39 S.W. 471, 472 [1]. In Willis v. American National Life Ins. Co., Mo.App., 287 S.W.2d 98, 107 [16], the court said: "The recovery of attorney's fees by the successful litigant is not a matter of right which follows automatically from and because of the fact that justice of his claim has been established; attorney's fees are recoverable when and only when they are provided for by contract (for instance a note) or allowed by statute." The law is similarly stated in Duncan v. Townsend, Mo.App., 325 S.W.2d 67, 71 [7, 8]: " * * * Ordinarily, attorneys' fees are recoverable only when called for by contract or provided by statute, or as an item of damage when their incurrence involves the wronged party in collateral litigation, or occasionally, when a court of equity finds it necessary to adjudge them in order to balance benefits." The last case cites State ex rel. Moore v. Morant, Mo.App., 266 S.W.2d 723, upon which insured relies here. That was an action against a constable and his surety for false return on a summons upon which a judgment was rendered against relators. A writ of garnishment issued and relators hired attorneys to set aside the garnishment and settle with the judgment creditor. The attorneys' fees were there held to be a natural and proximate damage resulting from the wrongful return. We do not consider the case as authority for attorneys' fees in the present case because of the agreement by which the insurer was permitted to make policy defenses including denial of coverage. In other words, even though insured's decision to hire attorneys was occasioned by insurer's position in the garnishment action, the insured consented by the nonwaiver agreements to that action by the insurer.

Also cited in Duncan v. Townsend, supra, was Allstate Insurance Co. v. Hartford Acc. & Ind. Co., Mo.App., 311 S.W.2d 41, 48 [12], where the court held that an unsuccessful attempt to bring Hartford into the case as a third-party defendant was analogous to a declaratory judgment action to determine policy liability and that the action did not fall in one of the classes in which attorneys' fees are recoverable. Thus, the insurer could have had the matter of coverage settled in a declaratory

judgment action against its insured and not have been responsible for the attorney fees in the insured's defense of such action.

The insured cites a number of cases which are not in point because they are cases in which the insurer has refused to defend or they do not involve a situation such as we have where the insured has agreed to permit the insurer to defend and appeal in behalf of the insured while reserving at all times the right to deny or litigate the existence of coverage. Accordingly, we deny the request for attorneys' fees.

The judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.