John L. MOORE, Individually and as a Member and a Representative of the Class of Voters Residing in Ward I, City of Pacific, Missouri, Prior to March 6, 1973, Plaintiff-Appellant,

and

Udell Adams et al., Plaintiffs,

v.

CITY OF PACIFIC, Missouri, et al., Defendants-Appellees.

No. 35818.

Missouri Court of Appeals,
St. Louis District,
Division One.

Jan. 6, 1976.

Motion for Rehearing or Transfer Denied Feb. 26, 1976.

Application to Transfer Denied April 14, 1976.

Louis Gilden, St. Louis, Eric Schnapper and Jack Greenberg, New York City, for plaintiff-appellant, plaintiffs.

Millsap, Weil, Eyerman & Schenberg, Wayne L. Millsap, Clayton, James L. Anding, Pacific, for defendants, appellees.

RENDLEN, Judge.

John L. Moore, plaintiff below, appeals from a judgment denying his petition to invalidate a March, 1973 ordinance, establishing new ward lines in the City of Pacific. In addition, appellant sought the following: an order reinstating pre-existing ward lines; an order setting aside the city election held April 3, 1973; an order prohibiting aldermen named in that election from assuming office; a mandatory injunction directing a new election be held in accordance with pre-existing ward lines; an order directing the prosecutor of Franklin County to investigate the burning of appellant's home; an order convening a grand jury and directing the prosecuting attorney to present evidence and that indictments be returned as soon as practicable; an order directing all defendants to cooperate with the prosecuting attorney, and if not, that they be prosecuted for obstruction of justice; and finally, an order for damages and attorney's fees.

The action was precipitated by a controversial city election of April 3, 1973, in which appellant was an unsuccessful candidate for alderman. Following his bid for office, appellant and other named individuals brought suit in the circuit court seeking the relief set out above.

Appellant's contentions on appeal may be summarized as follows: (1) the court erred in not finding that officials of defendant city *discriminated* against plaintiff John Moore, (a) by their "thoughtlessness"· toward his constitutionally protected rights, (b) by acts of "intimidation" toward appellant and other black citizens, including the burning of Moore's home prior to the election, and (c) by "retaliation" against John Moore after suit was brought; (2) the court erred in not holding that official acts of the defendant city, violative of the due process clause of the U.S.Const., and Art. I, § 10 of the Const. of Mo., 1945, constituted racial discrimination toward appellant John Moore denying him and the "class he represents" the right to vote. Acts complained of include procedures employed in passage of the redistricting ordinance and numerous violations of procedural safeguards surrounding the election of April 3, 1973; (3) the court erred by not finding defendants infringed appellant's right to vote, in that the city's redistricting ordinance created malapportioned districts gerrymandered on the basis of race thereby minimizing black voting power; (4) appellant's fourth point is argument to the effect that his action was *not* an election contest but rather one seeking redress for violation of constitutional rights. This is not a proper point for review; it is instead an apparent effort by appellant to avoid the barring effect of

§ 124.250, RSMo 1969;[1] (5) point five is in the nature of a prayer suggesting sundry affirmative relief in the event of reversal.

■ As directed by Rule 73.01(3), V.A. M.R., in this nonjury case, "the court shall review the case upon both the law and the evidence as in suits of an equitable nature. Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached, V.A. M.R., § 73.01(1)(b)[2] and this court is to enter such judgment as the trial court should have entered. *Glaves v. Glaves*, 523 S.W.2d 169, 172[8] (Mo.App.1975). In this frame of reference we examine the record.

## FACTS

Prior to March 6, 1973, Pacific, a city of the fourth class, had two wards separated by Sixth Street—Ward I on the east, Ward II on the west. Appellant's witness George A. Detchemendy, a former mayor and alderman, testified the original wards were based on population considerations; and in 1973 the population of the wards was approximately equal with 966 registered voters in Ward I and 905 in Ward II. It was estimated that 90 to 95% of the city's eligible voters were registered and of that number only 40 to 60 were black, (one estimate was 100 black voters) most of whom lived in Ward I.

For some time residents of "The Cedars," a large subdivision recently developed at the western edge of the city, had urged redistricting of the wards. At the regular February 20, 1973 aldermanic meeting, attended by plaintiff Udell Adams, about 30 "Cedar" residents orally petitioned for establishment of a third ward. The city attorney, who stated that redistricting could be accomplished in time for the April 3 election, was directed by formal motion to assemble information concerning ward redistricting for presentation on March 6, the next regular meeting of the Board.

Following the February 20 meeting, defendants James Anding (city attorney) and Leroy Alt (alderman) met with Emmett Reed, the clerk of Franklin County, and discussed dividing the city into three wards. Reed told Anding that redistricting would cause confusion with people voting in one ward for county candidates and another for city officers. He also argued it was too late to change the voter registration books since they must be closed by law 28 days prior to the April 3 election. Reed admitted, however, that on numerous prior occasions city officials had discussed the need for redistricting the city into three wards as existing wards had grown too large.

Nelvin Cawley, a black, filed for the office of first ward alderman on or about March 1, 1973, but withdrew March 23 because of possible conflict with his employment at the Federal Reserve Bank.

At the regular March 6, 1973 aldermanic meeting, redistricting Ordinance No. 1104 dividing the city into three wards was introduced, discussed, given three readings and adopted. Ordinance No. 1105, extending the time of candidates' filing to March 24, 1973, was adopted at the same meeting and appellant, who availed himself of its provisions by filing for office on March 14, quite interestingly does not complain of its manner of passage.

---

1. Section 124.250, RSMo 1969, providing procedures in election contests for municipal officers is in pertinent part as follows: "The several circuit courts shall have jurisdiction in cases of contested elections for . . . municipal . . . offices . . but no election of any such . . . municipal . . . officers shall be contested unless notice of such contest is given to the opposite party within twenty days after the votes have been officially counted. The notice shall specify the grounds upon which the contestant intends to rely, and if any objection be made to the qualifications of any voters, the names of such voters and the objections shall be stated therein."

2. All statute references are to V.A.M.S., 1969, and rule references to V.A.M.R.

Redistricting Ordinance No. 1104 changed the boundary between Wards I and II from Sixth to First Street and designated a boundary line between new Wards II and III at Western Avenue. Though confusion abounds as to ward population, according to County Clerk Reed, the distribution of *registered voters* under the new apportionment was: Ward I–539, Ward II–1048, Ward III–284. Appellant and his witness Cawley, both in attendance at the March 6 meeting, admitted that a majority of those present represented the Cedars and favored establishing three wards in the city. Neither the redistricting ordinance nor a map of the districts was published, though a local newspaper, *The Meramec Transcript*, carried two accounts of the Board's action. Detchemendy and Moore testified that the city's black voters were divided in half by the redistricting.

On March 14, John Moore filed as aldermanic candidate in the newly districted first ward and while he and his wife were at a drive-in theatre, on March 31, an explosion and fire partially destroyed their house. Members of the city fire department, City Marshal Pete Albertson (a named defendant), the Franklin County Police, and sheriff's deputies came to the scene. During the night an arson suspect was arrested and interrogated but released the following morning on confirmation of a credible alibi. A gasoline can was discovered in the remains of the house; however as a result of confusion between Albertson and sheriff's deputies, neither assumed custody of the can and it disappeared. A second fire occurred at the Moore house early the following morning and the fire and police departments reported arson the cause of both fires. City Marshal Albertson hired a private investigator to assist in the investigation and the Board of Aldermen established a $5,000 reward for information leading to the arrest of whomever burned the Moore home. By Moore's admission, Albertson talked with him approximately six times and interviewed several friends and family members regarding possible causes

of the fire. Unfortunately, two weeks after the fire, appellant ordered a bulldozer to clear the ruins of his house without inquiring whether investigation of the debris had been completed.

The city election was held April 3 with results as follows:

Alderman from Ward I

| | | |
|---|---|---|
| Arnold Viehland | – 154 | (including 4 absentees) |
| John Moore (appellant) | – 151 | (including 5 absentees) |
| Total | 305 | |

Voters certified as having appeared and voted in each ward were: I–319, II–473, III–206. The number of votes cast for mayor (not including 11 absentees) was: I–310, II–467, III–203.

The number of votes cast for alderman by wards (including 13 absentee votes) was: I–308, II–382, III–372.

The first ward total included three write-in votes not shown in the above total of 305 cast for Moore and Viehland.

Because there were two aldermen to be elected in Ward III, voters in this ward could vote for two aldermen; the proper comparative figure would be 186 (one-half of 372) to a maximum 206.

Appellant offered evidence that the only black employees hired by the city were in its rubbish department; however, a black woman had been named an election official in the 1973 election and a black man served as secretary to the City Zoning Appeals Board.

There are two cemeteries in the City of Pacific. One, suffering from inadequate maintenance, is largely used by the black population and the other by the white. According to plaintiff's witness Detchemendy, the segregation has come about through custom without official intervention and there are no legal restrictions on burial in either. The "white" cemetery may be reached by a through road while the "black" cemetery is served by one which dead ends. City action to improve access to

the latter was blocked by the owner of the land through which the service road runs.

## PARTIES

Before reaching plaintiff's contentions on the merits, we must determine who is before this court on appeal. Suit was filed by John Moore and ten others as individuals and as purported representatives of a class of voters residing in original Ward I of the City of Pacific.

■■ Supreme Court Rule, § 52.08(c)(1), requires, "as soon as practicable after the commencement of an action brought as a class action, the *court shall determine by order* whether it is to be so maintained." (Emphasis added). The trial court made no finding under Rule 52 as to the existence of a class. Appellant's ambiguous petition attempting to define the class states in part:

"The class which plaintiffs represent is composed of *voters in the original Ward I prior to March 6, 1973, who have been deprived of voting for a candidate for alderman* by reason of the actions of the defendants in redistricting contrary to law and by reason of racial prejudice." (Emphasis supplied).

From this statement appellant would seem to define the class as that group carved from old Ward I and added to new Ward II who were thus denied the opportunity of voting for aldermanic candidates in original Ward I, or perhaps appellant seeks to designate that group who remained in new Ward I but whose voting power was allegedly diluted by the ordinance, or perhaps the class is intended to consist of both. In any event, the class was never adequately defined, sufficiently proved, nor legally established by order of the court. No finding was made to satisfy the prerequisites of Rule 52.08: (1) that the class was so numerous that joinder of all members was impractical; (2) that there are questions of law or

fact common to the class; (3) that the claims or defenses of representatives are typical of the claims and defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class. If the class was that group carved from Ward I, John Moore was not a member, as his residence remained and he sought office in that Ward. The class described in the petition was "voters in the original Ward I" who "have been deprived of voting for a candidate for alderman" by reason of the redistricting. If this was meant to include those *remaining* in the ward, John Moore so remained but he was not prevented from freely exercising his franchise in the April election and thus was not "deprived of voting for a candidate for alderman." There was no determination that the prerequisites of Rule 52.-08(c)(1) were met and no notice issued to the purported members of the class.[3] See *Geraci v. Treuchtlinger,* 487 F.2d 590, 592[3] (2d Cir. 1973). The pre-trial order is a required condition precedent for maintenance of a class action. *Stebbins v. Nationwide Mutual Ins. Co.,* 469 F.2d 268, 270 n. 3 (4th Cir. 1972) cert. den. 410 U.S. 939, 93 S.Ct. 1403, 35 L.Ed.2d 606 (1973); J. Moore, 3B Moore's Federal Practice ¶ 23.50 (2d ed. 1969). As this suit was not perfected as a class action, we deem that appellant is before this court as an individual only. *Davis v. Romney,* 490 F.2d 1360, 1366 [8–10] (3rd Cir. 1974); see also *Gerachi* and *Stebbins, supra.* To hold otherwise would bind numerous persons to a judgment without determining if they in fact constitute a proper class or whether the named representatives fairly and adequately represent their interests.

The notice of appeal states that:

"John Moore individually and as a *member* of the class of voters residing in Ward I, City of Pacific, Missouri . .

---

**3.** Suit was filed on May 2, 1973. 'On June 23, defendants filed their motion to dismiss class action for failure to have a class or a representable cause. No action was had on this motion until overruled October 4 at the close of the case. No other action of the parties or ruling by the court appear regarding the purported class action.

appeals from the judgment entered . . . ." (Emphasis supplied).

No other individual plaintiff has appealed.[4] Parties jointly interested in a judgment may appeal separately, Rule 81.02, and the notice of appeal shall specify the parties taking the appeal, Rule 81.08. The other individual plaintiffs have not appealed and judgment as to them is final. Since only John Moore is named in the notice and since his only status throughout the suit has been as an individual, this appeal is limited to the trial court judgment as it affects Moore individually. *Ballwin Plaza Corp. v. H. B. Deal Construction Co.,* 462 S.W.2d 687, 688[1] (Mo.1971). See *Donnell v. Vigus Quarries, Inc.,* 489 S.W.2d 223, 224[1] (Mo. App.1972).

## POINT I

Appellant first contends the trial court erred by not finding that city officials of Pacific violated his constitutional rights through "thoughtlessness," "intimidation" and "retaliation." [5]

■■ While facts necessary to recovery in civil cases may be proved by circumstantial evidence, such evidence must logically tend to show the existence of the principal fact to be proved. *Harrison v. Harrison,* 417 S.W.2d 39, 46–7[8–10] (Mo.App.1967). Proof of the principal fact may not arise from guesswork, conjecture or speculation and the circumstantial evidence should tend to exclude every reasonable conclusion other than the one desired. *Titone v. Teis Construction Co.,* 426 S.W.2d 665, 669[9] (Mo.App.1969). The acts alleged by appel-

lant as probative of racial discrimination are either unsupported by the facts or equally conducive to other logical inferences. "The duty to make his case is upon plaintiff and he must remove it from the field of conjecture and establish it by substantial evidence of probative value, or by inferences reasonably to be drawn from the evidence. If the evidence presents a situation from which liability or nonliability may be equally inferred, the court must declare that no case has been made." *Farnham v. Boone,* 431 S.W.2d 154, 156 (Mo.1968). For reasons set out herein, we find appellant failed to sustain his burden with respect to the allegation of racial discrimination.

■ Appellant does not suggest city officials of Pacific instigated burning of his home; however, he does complain the city marshal failed to properly investigate the fires. In particular, appellant faults him for losing the gasoline can found at the scene, releasing a suspect arrested the night of the fire, and failing to leave an officer at appellant's home after the first fire had been extinguished. The suspect arrested the night of the fire was released after interrogation when he established a credible alibi. The gasoline can was left at the scene of the fire, from which it disappeared, as the result of apparent confusion between the city marshal and Franklin County sheriff's deputies as to the responsibility for its custody. Documents introduced by appellant show that Marshal Albertson considered the investigation open and active; and as Pacific had no arson squad, he obtained the assistance of a private investigator; further, the Board of Alderman es-

---

4. Plaintiffs, Melvin Adams, George Johnson and George Adams, were not members of the group carved from Ward I and added to Ward II. Alice Brooks and George Detchemendy testified they were not properly of the class as defined. The whereabouts and permanent address of John Nullen, another original plaintiff, were unknown thus no showing was made to qualify him as a member of any class. Udell Adams' residence was taken from Ward I and added to Ward II.

5. By appellant's Points I, IA, IB, and IC, he contends that city officials discriminated against him by thoughtlessness, intimidation and retaliation, violative of *"his constitutionally protected rights."* These points in appellant's brief are narrowly close to inadequate statements of the urged legal propositions, under Rule 84.04(d). However, from the argument portion of the brief we learn that of the "constitutionally protected" right referred to is the "free exercise of the right of suffrage" and it is that issue we consider.

tablished a $5,000 reward for information leading to the arrest of the person who burned appellant's home. Appellant acknowledges Marshal Albertson talked to many people, including appellant, with whom he conferred at least six times and appellant's wife conceded Albertson interviewed several friends and family members. On April 14, two weeks after the fire, appellant removed the ruins of his house without inquiring of law enforcement officials whether investigation of the debris had been completed; and after filing suit, appellant and his wife refused to answer further questions by Albertson. The record does not support appellant's claim that Marshal Albertson and other city officials' so-called failure to properly investigate the fire constitutes evidence of racial discrimination. Implicit in the orders of the trial court is the conclusion that the actions of the city officials did not constitute racial discrimination denying appellant the free exercise of the right of suffrage; our review of the record confirms that finding.

It is next claimed that racial discrimination is demonstrated in the fact that the only blacks employed by the city are in the rubbish department; yet no evidence was offered that a black had ever been refused a city job on the basis of race nor is there evidence that city officials adopted policies or created an atmosphere in which it was futile for blacks to so apply. With respect to civic offices, a black woman was named as an election official in the 1973 election and a black man served as secretary to the City Zoning Appeals Board. Illustrative of a possible reason for minimal black employment in city jobs is the statement by Marie Adams, wife of plaintiff Udell Adams, (she had been chosen as an election judge) that "not many black people in that town [are] qualified to do a job."

■ Appellant alleges that the City of Pacific maintained segregated cemeteries and that the "black" or small cemetery was in a state of disrepair. One of the original plaintiffs, George Detchemendy, a former mayor and alderman of Pacific, testified

there were no formal restrictions barring burial in either cemetery on the basis of race nor had anyone been refused burial. The segregation has come about as a matter of custom without official intervention. This situation was reflected in the testimony of appellant's wife that in arranging for her son's funeral she made no attempt to bury him in the "white" or large cemetery because her family is buried in the smaller one. We fail to see how racial discrimination under color of state law can be found in the exercise of free choice by those claiming to be the victims of discrimination. For custom or usage to constitute state action, it must have the force of law by virtue of persistent practices of state officials. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Such is not the case here, nor do we find evidence of racial discrimination in the run-down state of the smaller cemetery. The lots are maintained through perpetual care contracts and the city hires a caretaker with those funds. In this case caretaker Udell Adams, an original plaintiff, did not indicate he was prevented or hindered by city officials from providing proper maintenance. There was testimony that the road in the smaller cemetery was in poor condition; but in the absence of evidence that black citizens were restricted to the smaller or prohibited from the larger, the problem does not rise to constitutional levels. Other remedies are available for citizens or owners of cemetery lots who believe that civic or contractual maintenance duties are being avoided.

■ Appellant argues numerous other instances of intimidation establish racial prejudice by city officials. We have examined each and find the contention without substance. As it would needlessly enlarge this opinion to treat them individually, suffice it to say that many of the instances involved intimidation of black citizens by white citizens and general racial tension in the city. It is fundamental to civil rights' cases that a cause will arise only for actions taken

under color of state authority. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Stanturf v. Sipes,* 224 F.Supp. 883 (W.D.Mo.1963), affmd., 8 Cir., 335 F.2d 224, cert. den. 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 (1965); *Weiss v. Leaon,* 359 Mo. 1054, 225 S.W.2d 127 (1949). Appellant does not allege, and no evidence was offered to support a finding, that confrontations between black and white individuals were instigated or approved by city officials.

■ We are constrained to specifically reject appellant's charge that James Anding, city attorney for Pacific, tampered with absentee ballots and acted "beyond propriety and law." Appellant claims that Anding "never denied that ·he played 'hanky panky' with the ballots, nor did he deny that he tampered with them." .We are singularly unimpressed with this contention. Defendant Anding was never presented with these questions while a witness and was afforded no opportunity to deny the same. It would be inimical to our system to treat as admissions, failure to answer questions unasked or failure to respond to allegations unproved. Plaintiff would shift the burden and raise a presumption of guilt on innuendo but reputation may not be so impugned nor facts so proved.

■ It is next contended that city officials "retaliated" because of appellant's suit charging racial discrimination. Appellant cites as authority Title VII of the Civil Rights Act of 1964, 42 U.S.C., § 2000e–3(a),[6] and *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir. 1969); neither are applicable to facts before us. in *Pettway* the court held that even patently false claims of discrimination made by an em-

ployee about his employer before the Equal Employment Opportunity Commission were privileged; and therefore, 42 U.S.C., § 2000e–3(a) would prevent the employer from discharging the employee for falsehoods. This employer-employee discrimination case has no broader application than. that delineated in the statute. Appellant would, by tenuous reasoning, broaden and generalize the meaning of § 2000e–3(a) to include so-called discrimination by retaliation in an area of public life unrelated to the purpose of the act. This we cannot do.

In the case at bar alleged incidents of retaliation include: (1) a letter from city attorney (Anding) to plaintiff's attorney (Greenberg); (2) a letter or memo from defendants' attorney Warren Mosley to plaintiff's insurance carrier dated May 31, 1973; and (3) a demand by the Bank of Pacific for delinquent monthly payment on the mortgage indebtedness due on Moore's home. In appellant's suit defendants are charged with failure or refusal to properly investigate the fires at appellant's home. The tenor of the pleadings strongly suggests defendants stifled investigation of the "crime" for discriminatory purposes. In response to these charges and in preparation of its defense, defendants' counsel gathered information tending to show, as an affirmative defense, appellant's possible involvement in the arson.[7] Investigators from appellant's insurance carrier sought information concerning the fire from many quarters including defendants and their attor; neys as well as plaintiff's attorneys. After no little effort they persuaded defendants' attorney Mosley to confidentially share information from his file gathered in response to the charge in appellant's petition. Further, Attorney Anding by letter of May 31, 1973, to appellant's counsel Greenberg,

---

**6.** 42 U.S.C., § 2000e–3(a) provides in part: "It shall be an unlawful employment practice for any employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

**7.** This information related to items of personal property reported to have been removed from the premises before the fire and allegedly later discovered in appellant's possession.

set forth his view of the facts in refutation of appellant's claims, advising defendants' counsel the suit appeared frivolous and asserting the evidence would not support appellant's contentions. He expressed surprise that he had been named a defendant, suggesting certain factual matters appellant's counsel might consider in determining if he wished "to pursue this matter further." Anding's letter is an expression of the theory and strength of defendants' case and the belief of defendants' counsel as to facts he will be able to prove. We cannot say the circumstances under which the information was solicited by the insurance investigator from Mosley's files or the private communication (while perhaps tasteless) between opposing counsel, constitute evidence of discrimination by retaliation. These circumstances are not within the scope of the cited Federal Statute nor can we find deprivation of appellant's right to due process as appellant suggests. There was testimonial conflict as to the validity of the factual matters suggested in Mosley's communication to the insurance company and in the letter from Anding to Greenberg. These disputed factual matters were implicitly resolved in defendants' favor by the findings and judgment of the trial court. We further note that Attorney Greenberg remained as appellant's co-counsel and the insurance company on completion of its investigation paid appellant's claim.

The third instance of so-called retaliation concerns the Citizens Bank of Pacific. The Bank had twelve years earlier loaned John Moore and his wife, $6,000 to buy their home in Pacific and on several occasions appellant was delinquent. The Bank condoned appellant's delinquencies for three months (April, May and June, 1973) before notifying appellant to pay or face legal action. Appellant made the payments claiming that at some later date he discovered the trustee named in the deed of trust, given to secure his note, was defendant Anding. It cannot be seriously argued that naming Anding as a trustee years earlier

can be considered retaliation in the case sub judice, nor can his continued presence as trustee or the Bank's demand for payment be construed an act with racial overtones.

Appellant claims the mentioned instances constitute, under color of state law, a deprivation of his 14th amendment rights of due process, having the practical effect of discouraging the exercise of constitutionally protected right of suffrage. *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) cited by appellant involves an Alabama state court order directing the NAACP to produce records, including its membership in an action by the state against the NAACP, charging failure to comply with the Alabama statute requiring foreign corporations to qualify before doing business in the state. The Supreme Court held the state court's action constituted a denial of "the members to pursue their lawful private interests" and a denial of their right "to associate freely with others," *Id.* at 466, 78 S.Ct. at 1174; and further that "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Id.* at 460[8], 78 S.Ct. at 1171. However, that case did not, as appellant urges, involve "retaliation" and we do not believe the acts of which appellant here complains are "actions of the state" as that denounced in NAACP, *supra,* and were not performed under color of law.

POINT II

Appellant next contends the March 6, 1973 action of the city was violative of due process in that redistricting Ordinance No. 1104 was introduced, given three readings, and passed at a single meeting of the Board.

Section 79.130, RSMo 1969, and its predecessor statutes, prescribe procedures for ordinance enactment in cities of the fourth class. The statute provides in part:

". . . no ordinance shall be passed except by bill, and no bill shall become an ordinance unless on its final passage a majority of the members elected to the board of aldermen shall vote for it, . . and *all bills shall be read three times before their passage* . . ." (Emphasis supplied).

It has been held that the three-reading's requirement is directory, not mandatory, and failure to read an ordinance three times prior to passage is not fatal. *Aurora Water Co. v. City of Aurora*, 129 Mo. 540, 31 S.W. 946, 955[2] (1895). If failure to provide three readings is not fatal to the bill, a fortiori three readings in a single meeting will not nullify the ordinance. Appellant argues that Mo.Const., Art. III, § 21, 1945, requires the *state legislature* to read a pending bill by title on three different days in each house; however, the legislature by § 79.130 imposed no such requirement upon fourth class cities, requiring merely that such bills shall be "read three times before their passage."

We have reviewed the cases cited by appellant and find none controlling or persuasive on the facts here, nor do we find evidentiary support for invidious motives appellant would ascribe to the Board's actions. From the record it appears redistricting was undertaken because the existing wards had grown too large for fair representation of residential areas recently developed in the city. It is significant that at the same meeting, the Board adopted Ordinance No. 1105 extending the period for filing to March 24 to offset the effect of reapportionment on candidates within the various wards. The Board's action was not precipitous as appellant insists since there were numerous previous discussions between city and county officials and again at the February meeting of the Board concerning the need for and desirability of changing ward lines to accommodate residents of the new Cedars subdivision. These actions occurred prior to the early March filing of black candidate Nelvin Cawley (who withdrew) and prior to the March 14, 1973 filing of appellant John Moore.

Appellant, present at the March 6 meeting, had actual notice of the ordinance's passage and its terms. Thereafter on March 14 he filed for aldermanic office and mounted a nearly successful campaign for election. Knowing the new ward in which he filed, appellant sought office from that ward rather than attack the redistricting ordinance's validity. Appellant gives no indication that he sought any relief during this period. Where actionable election practices are discovered prior to the election, injured persons must be diligent in seeking relief. *Toney v. White*, 488 F.2d 310 (5th Cir. 1973). City Ordinance No. 1105 extending the time for candidates' filing to March 24, was introduced, given three readings and passed March 6, and appellant does not complain that it too was thrice read and passed the night of its introduction. Appellant urges *Briscoe v. Kusper*, 435 F.2d 1046 (7th Cir. 1970) as authority that procedures for enactment of the questioned ordinance was violative of the due process. However, unlike the case at bar, in *Briscoe*, twelve candidates *barred from the ballots* in a Chicago Aldermanic Election and nineteen voters who signed their nominating petitions filed suit under 42 U.S.C., § 1983,[8] on the grounds that the administrative procedures for validating nominating positions were changed by the election board which had no published administrative rules or other announcement that would have given notice of the changes. The same board invalidated the petitions of the plaintiffs and barred them

---

**8.** Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

as candidates in the aldermanic election. The court of appeals found the Board's unannounced procedural changes unreasonably limited plaintiffs' rights of free association in violation of due process under the fourteenth amendment and effectively denied plaintiffs a place on the ballot thus raising a constitutional question not present here. The *Briscoe* court concluded that the right of "access to official election ballots represents an integral element in effective exercise and implementation of those activities." *Id.* at 1054[6]. There is no showing in the case before us that the method of passage or failure to publish the ordinance deprived appellant an opportunity to seek office, appear on the ballot, or vote. Advance notice that redistricting would be discussed at the March 6 meeting occurred at the aldermanic meeting of February 20, 1973. The possibility of establishing a third ward was raised and it was decided that information for that purpose would be compiled and presented at the next regular meeting. Attending the February 20 meeting was plaintiff Udell Adams, who urged John Moore to seek office. These facts belie appellant's claim that the spirit of § 79.130 was violated and vitiates the charge of clandestine or hidden motive of the city in its enactment of the reapportionment ordinance. Appellant argues that we

should disregard the statutory and case law, elevate the directory terms of the statute to constitutional status, and find that respondents have given insufficient notice to the citizenry of the proposed redistricting in violation of their rights under the due process clause. This we cannot do. The power to reapportion cities of the fourth class is placed in the Board of Aldermen by virtue of § 79.060. Statutes pertaining to first class cities (§§ 73.030, 73.040, 74.050) provide time limitations on ward redistricting but no similar provision appears for fourth class cities.[9] Section 79.060 provides for not less than two wards with no mention of ward changes. We are unwilling to read into the statute, requirements not prescribed by the legislature. *Missouri Public Service Co. v. Platte-Clay Electric Cooperative, Inc.,* 407 S.W.2d 883, 891[13] (Mo.1966).

Appellant next argues the trial court erred in not finding that the totality of statutory violations in the conduct of the April 3 election constituted a denial of due process, depriving him, his right to vote. Appellant alleges that 37 violations of Chapters 111 and 112, RSMo 1969, several of which are discussed elsewhere in this opinion, were racially motivated. These alleged violations are, for the most part, technical errors in the administration of the election.[10] It is unnecessary to discuss each

---

9. Appellant asserts that § 79.030, providing that "all city elections shall be *held* under the provisions of chapter 111, . . . all duties specified in the state election laws to be performed by the county clerk shall be performed by the city clerk in the city elections," incorporates by reference the publication requirements for redistricting counties in § 111.101, RSMo 1969. While we are not persuaded this is correct in light of the separate redistricting provisions of § 79.060, we nonetheless agree that some notice of redistricting would seem necessary. However, as we are overturning the redistricting ordinance on other grounds we need not, *and do not,* here decide this issue.

10. Plaintiff alleges 22 violations of Chapter 111 [conduct of elections] and 15 violations of Chapter 112 [absentee voting] RSMo 1969. Alleged Chapter 111 violations include failure to publish the redistricting ordinance [treated elsewhere in this opinion], location of polling places, designation of

election officials, residence of election officials, the color and nature of the paper on which ballots are printed, absence of voter instructions on ballots, marking of ballots, activities of the judges and clerks of the election relating to secrecy of the count, certain haphazard poll book entries, oaths of judges and clerks of elections, objection to and segregation of challenged ballots, methods of sealing envelopes containing ballots and certain ministerial functions regarding the handling, closing and sealing of poll books, and certification of election within five days to those elected. Alleged Chapter 112 violations include the printing, distribution, time of distribution, form of affidavit, opening, counting, folding, stringing, rejecting, separating and preserving absentee ballots. Only two of the errors under Chapter 111 *could* have effected the final tally and plaintiff has not pled nor proved such effect. Of the alleged errors under Chapter 112, only three had any potential

instance individually though the record indicates that many of the ministerial acts undertaken by various individuals and miscellaneous election officials may have been contrary to technical requirements of the statutes. We have instead examined them collectively for possible racial discrimination and constitutional violations and find none.

 In Point IV of his brief, appellant consciously foreclosed reliance on election contest statutes stating that his suit was one to redress violation of constitutional rights and not an election contest under § 124.250.[11] Accordingly, we do not reach the issue of whether one candidate received more votes than another, 29 C.J.S. Elections § 249; *Phelps v. Fenix*, 345 Mo. 440, 134 S.W.2d 84, 88 (en banc 1939).

 For appellant to prevail on the constitutional issue it is not sufficient merely to "invoke the talisman of due process or equal protection," *Moore v. Kusper*, 465 F.2d 256, 259[2] (7th Cir. 1972), nor will an election be set aside if discrimination is found unless that discrimination was gross, spectacular and wholly indefensible. *Toney v. White*, 488 F.2d 310 (5th Cir. banc 1973). In actions of this nature a cause is not made by showing clerical irregularities in the administration of an election without also showing that they were racially motivated or the product of fraudulent intent. *Gray v. Main*, 309 F.Supp. 207, 215 (M.D.Ala. 1968), decided under the Voting Rights Act of 1965, 42 U.S.C., §§ 1971, 1973. Uneven or erroneous application of election statutes constitutes denial of equal protection only if it represents intentional and purposeful discrimination. *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402[10–11] 88 L.Ed. 497 (1944), rehearing denied; *Powell v. Power*, 436 F.2d 84, 88[4, 6] (2d Cir. 1970). This intentional and purposeful discrimination must be proven, not merely asserted.

*Swain v. State of Alabama*, 380 U.S. 202, 205, 85 S.Ct. 824, 827[3] 13 L.Ed.2d 759, 764 (1965). The due process clause offers no guarantee against mere errors in the administration of an election; those errors are to be corrected by state law when adequate remedies are available. *Powell v. Power, supra. Moore v. Kusper, supra*, quite similar to the case before us, involved suit by two candidates for political office who challenged procedures used by the Chicago Board of Election Commissioners in selecting election judges. Plaintiffs charged the Board's alleged violation of election laws deprived them of equal protection, due process, freedom of association and the right to vote and have their vote counted. However, the 7th Circuit held that the complaint failed to allege the appointment of election judges would subvert the election process and result in injury to plaintiffs or deprive members of the franchised public of their right to vote.

 Appellant argues the sheer volume of election law violations deprived black citizens of their right to vote; however, he fails to show how they were peculiarly discriminatory against black voters. The facts here are distinguishable from *McDonald v. Key*, 224 F.2d 608 (10th Cir. 1955), where racial discrimination was found in the fact that the word "Negro" was required by statute to follow the name of a black candidate for the U.S. Senate, and from *Toney v. White, supra*, cited by appellant, where voter rolls were purged of black voters but not of white, in a manner contrary to the statutes.

Similarly, *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970), an employment discrimination case cited by appellant, is distinguishable because though the percentage of black employees to whites may demonstrate employment discrimination, it does not follow that election law

for changing the final count and only one could have effected the result; but even as to that one, appellant has failed to allege and show the result actually was effected.

11. Appellant's Point IV states, "This court should find that this suit is not an election contest, in that plaintiff seeks redress of constitutional rights rather than canvassing of election returns."

violations affecting all citizens demonstrates discrimination against black voters. The fact that Moore and certain other plaintiffs were black and were among voters in an election in which there were numerous irregularities, with nothing more, does not establish racial discrimination. That there are few if any black citizens in the community is not controlling when we see that most blacks registered and apparently voted. We have been shown neither discriminatory intent nor that the effect of the election irregularities fell substantially on Pacific's black citizens. The fact that a black candidate narrowly lost an election does not satisfy this paucity of proof. Further, it is apparent from the final tally that most of John Moore's votes were from the white community. Five of plaintiffs' witnesses, including two named plaintiffs in the suit, testified that they were not aware of any instance in which a person was denied the opportunity to vote. Appellant testified that he was neither denied the opportunity to freely cast his ballot nor did anyone interfere with his campaign through threats or coercion.

Appellant raised the spectre of racial discrimination in the ministerial election procedure irregularities but failed to substantiate his claims. In the absence of such proof, we are left with little more than election irregularities for which other remedies may be pursued under state law. *Powell v. Power, supra.*

### POINT III

■ We next consider appellant's contention that enactment of Ordinance No. 1104 created malapportioned districts and constituted a racially motivated gerrymander operating to minimize or cancel the voting strength of the black population in Pacific, by dividing the city's black voters between two wards. Plaintiff has the burden of proving the constitutional impermissibility of the reapportionment plan and an inference that racial considerations motivated reapportionment legislation must be

"equally or more justifiable" than "other inferences" in order for plaintiff to meet the "difficult burden" of attacking the constitutionality of apportionment legislation. *Wright v. Rockefeller*, 376 U.S. 52, 57, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

Although an inference of racial bias could be drawn from the ward reapportionment here, we have carefully considered the evidence and conclude legitimate inferences to the contrary, indicating nonracial considerations, seem equally or more justifiably drawn.

■ We first view the reapportionment scheme in the context or setting which gave rise to its enactment. *Smith v. Paris*, 257 F.Supp. 901, 904[2] (M.D.Ala.1966), mod. and affmd., 386 F.2d 979 (5th Cir. 1967). Although the history of the City of Pacific shows that no black had filed for the Board of Aldermen in at least 60 years, there was no evidence that any black had ever so attempted and was restrained overtly or covertly from so doing. Further, the record shows that pressure by the Cedars' neighborhood for representation and urging of the county clerk that the wards were too large, were the immediate nonracial considerations.

Admittedly, the Board's action to reapportion within four weeks of the election is suspect. More than two years had passed since the last census; and despite the fact the county clerk had recommended the wards be reapportioned, the Board of Aldermen had failed to act. However, distinguishing this case from *Smith v. Paris, supra*, the minutes of the February 20, 1973 aldermanic meeting show the issue of reapportionment *was* seriously considered *prior* to enactment of the March 6, 1973 reapportionment ordinance, and prior to the filing of a black candidate (Nelvin Cawley) for office. The enactment procedure, with three readings on the night of passage, though less than desirable, was neither illegal nor anomalous.

It should be noted that relief on the grounds of racially motivated gerrymander

has been granted in the past primarily in cases involving election districts with a majority or parity of blacks prior to the redistricting *and* substantial reduction of that majority or parity by the redistricting. In such cases the primary objective of gerrymandering is to pervert the process of political subdivision so as to avoid minority representation of minority voting groups. Large black populations capable of electing black representatives on their own strength lay at the factual basis of relief granted in *Sims v. Baggett*, 247 F.Supp. 96 (M.D.Ala. 1965); see also *Smith v. Paris*, 257 F.Supp. 901 (M.D.Ala.1966), mod. and affmd., 386 F.2d 979 (5th Cir. 1967); *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973); and *Robinson v. Commissioners Court, Anderson County*, 505 F.2d 674 (5th Cir. 1974).

Appellant in this case did not prove substantial black voting strength in the City of Pacific or that the redistricting worked an impermissible dilution of that strength. The highest estimated number of black voters in Pacific was "under a 100," according to Nelvin Cawley, the first black candidate to file. (Other estimates of black voters were 40 to 60). Assuming the accuracy of this testimony, 100 black voters represented 10.4% of the 966 registered voters in the pre-March 6 Ward I—neither a majority nor parity of black voters. Further, assuming the accuracy of the post-March 6 voter registration statistics and assuming the accuracy of testimony that the redistricting cut the black vote in half, 50 black voters would represent 9.3% of the 539 registered voters of new Ward I. The reduction from 10.4% to 9.3% is not an impermissible dilution of voting strength.

██ We hold that plaintiff did not sustain his burden of proving that enactment of Ordinance No. 1104 was racially motivated nor did it effectively minimize or cancel the voting strength of the black population of Pacific.

Appellant further contends that Ordinance No. 1104 resulted in uneven population distribution between the wards.

Though ward *population* figures are not clearly developed, the county clerk testified that registered voters in the old ward were: Ward I–966, Ward II–905; and that registered voters in the new wards were: Ward I–539, Ward II–1048, and Ward III–284.

██ Legislative reapportionment is à justiciable issue upon which an aggrieved citizen, whose right has been impaired, may resort to the courts for relief. *Baker v. Carr*, 369 U.S. 186, 204–208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Gray v. Sanders*, 372 U.S. 368, 375, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); and *Armentrout v. Schooler*, 409 S.W.2d 138, 142[2] (Mo.1966). Statutes which provide for the selection of legislators upon a basis of unequal apportionment of population in the respective districts may be declared unconstitutional as in violation of the equal protection law of the fourteenth amendment. *Gray v. Sanders, supra* ; *Wesberry v. Sanders, supra; Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); and *Armentrout v. Schooler, supra* [3–12]. The firm doctrine of one man-one vote is controlling here.

Both the Supreme Court of Missouri and of the United States have held the principle of "one man-one vote" is applicable to units of local government. *Armentrout v. Schooler*, 409 S.W.2d 138 at 144[12] (Mo. 1966); *Hadley v. Junior College District*, 397 U.S. 50 at 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); and *Avery v. Midland County*, 390 U.S. 474 at 476, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

> "Government—National, State, and local—must grant to each citizen the equal protection of its laws, which includes an equal opportunity to influence the election of lawmakers, no matter how large the majority wishing to deprive other citizens of equal treatment or how small the minority who object to their mistreatment." (390 U.S. 474 at 482 n. 6, 88 S.Ct. at 1119).

The decisive question here is whether Ordinance No. 1104, redistricting the City of Pacific from two wards to three, meets the constitutional standards of "one man-one vote"—that is, whether the legislative body made "an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Reynolds, supra* 377 U.S. at 577, 84 S.Ct. at 1390. The difficulty lies, to an extent, in the fact that while establishing "equal population" as the basis for apportionment the courts have failed to define what is meant by the term "population."

■ In challenging an apportionment plan, the burden is on plaintiff to prove the inequality of votes in the different units under the plan. Typically, this is done by examining the basis of the reapportionment plan (commonly state citizenry population), calculating the ideal population distribution, and demonstrating a variance occurs which exceeds the *Reynolds* criterion of "as nearly as practicable." Plaintiff must establish a prima facie case of invidious discrimination by presenting evidence of district population deviations. *Swann v. Adams*, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). The burden then shifts to the legislative body to show that the variances were either unavoidable after a good faith effort or justified by a rational state policy. *Reynolds, supra* 377 U.S. at 579, 84 S.Ct. 1362. In either case, the variations must be reasonably limited so as not to emasculate the goal of substantial equality. *Mahan v. Howell*, 410 U.S. 315, 326, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) mod., 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316.

In the instant case the ordinance does not appear to have been based on either population or voter registration statistics. Appellant suggests a strong correlation between the number of registered voters, eligible voters and population of the wards. As stated in *Burns v. Richardson*, 384 U.S. 73, 91, 86 S.Ct. 1286, 1296, 16 L.Ed.2d 376 (1966), "We start with the proposition that the Equal Protection Clause does not require the States to use total population

figures derived from the federal census as the standard by which this substantial population equivalency is to be measured. . . . [O]ur discussion [in *Reynolds v. Sims*] carefully left open the question what population was being referred to. At several points, we discussed substantial equivalence in terms of voter population or citizen population, making no distinction between the acceptability of such a test and a test based on total population." In Burns, the court held that an apportionment plan based on registered voters satisfied the Equal Protection Clause "because on this record it was found to have produced a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis." 384 U.S. at 93, 86 S.Ct. at 1297.

■ On the basis of the post-March 6 registered voter statistics (Ward I–539, Ward II–1048, Ward III–284), plaintiff clearly evidenced that the variances in this case between the wards are excessive: The weight per vote in Ward I is twice that of a vote in Ward II but approximately half the weight of one in Ward III. The weight of a vote in Ward III is nearly four times the weight of one in Ward II. With a total of 1871 registered voters, the deviation of the wards under the reapportionment ordinance from the ideal 624 registered voters per ward is: Ward I–13.6%, Ward II + 67.9%, Ward III–54.5%.

The average deviation is equal to ± 45.3% and the maximum deviation between any two voting districts is 122.4%. The ratio of the largest to the smallest district is 3.73:1.00; 43.7% of the registered voters can elect 66.7% of the Board of Aldermen.

Plaintiff does not rest his case solely on the registered voter statistics, but attempts to also show, as required by Burns, that the registered voter statistics do not produce a substantial difference in the size of districts from that which would have resulted from the use of a more permissible population basis. The number of voters certified (i. e.,

citizens who come to vote and whose names appear in the "official poll books," in each ward for the April 3, 1973 election), and the actual number of votes cast in that election sustain further appellant's malapportionment contention. The number of voters certified were: Ward I–319, Ward II–473, Ward III–206. The number of votes cast for mayor were: Ward I–310, Ward II–467, Ward III–203. The number of votes cast for alderman indicates similar malapportionment. Some extrapolation is necessary in light of the fact that voters in Ward III could vote two times for aldermanic positions. The number of votes cast were: Ward I–308, Ward II–382, Ward III–327 (at most 206 for one candidate). See *Armentrout v. Schooler*, 409 S.W.2d 138, 141 (Mo., 1966).

The county clerk indicated that 90 to 95% of the eligible voters in Pacific were registered voters. (See *Burns v. Richardson*, *supra*, 384 U.S. at 96, 86 S.Ct. 1286, where a correlation of 87.1% was held acceptable). The record indicates that the wards existing prior to March 6, 1973, were apportioned equally on the basis of population. Considering that the numbers of registered voters in the original wards were approximately equal, the implication is that there was a strong correlation between the number of registered voters and the total population of the City of Pacific.

In view of the above it seems that the Board of Aldermen could have constitutionally used either registered voter, eligible voter, or total population statistics as a basis for apportionment and conversely, discrimination or debasement of the vote may be evidenced by any of these statistical bases. We hold that plaintiff has met its burden of establishing a prima facie case of discrimination.

The statistics reveal that even if defendant had defended the reapportionment plan's results as unavoidable or justified (which it did not attempt at trial), the variances are of such magnitude that they clearly exceed variations justified by any apparent state interest. *Gaffney v. Cummings*, 412 U.S. 735, 744, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

## REMEDIES

Appellant has made a prima facie showing that the 1973 ward redistricting was not guided by the principles of one man-one vote. The City of Pacific failed to offer evidence that the new wards were based on census or other factual population data or to demonstrate that the variances were unavoidable after a good faith effort or justified by a rational state policy.

Accordingly, the judgment of the circuit court is reversed and we adjudge that: (1) the provisions of Ordinance No. 1104 of the City of Pacific, Missouri, passed on March 6, 1973, which redistricted the aldermanic wards of the City of Pacific from two to three are hereby voided; (2) the orderly operation of government requires the present board of aldermen elected under said Ordinance No. 1104 be permitted to function until the next regularly scheduled aldermanic election—April 1, 1976; (3) the validity of the acts of the city council from March 6, 1973, to the date of such election shall not be challenged or invalidated on the basis of this decision; and (4) a new Board of Aldermen shall be elected from wards as they existed prior to March 6, 1973, unless, however, the city by proper legislative action shall redistrict the city wards in due time to permit an orderly election of aldermen under a new ward plan at the April, 1976 election.

■ Appellant asks the cause be remanded for a determination of damages based upon appellant's claims having been brought under 42 U.S.C. §§ 1981, 1983 and 1985, for injuries done to the person. While we have granted relief as to the redistricting, we have found no basis in the law for awarding damages under these facts and having found no basis for appellant's claims of wrongful discrimination, his other requests for relief are also denied.

Further, appellant asks that we award attorney's fees. The rule in Missouri is that "attorneys' fees in this state are ordinarily ' "recoverable only when called for by contract provided by statute, or as an item of damage when their incurrence involves the wronged party in collateral litigation, or occasionally, when a court of equity finds it necessary to adjudge them in order to balance benefits." ' " *Rook v. John F. Oliver Trucking Co.*, 505 S.W.2d 157, 161[4] (Mo.App.1973). See also *In re L. G.*, 502 S.W.2d 33, 36[3] (Mo.App.1973); *Arnold v. Edelman*, 392 S.W.2d 231, 239[2] (Mo. 1965); *Willis v. American National Life Ins. Co.*, 287 S.W.2d 98, 107[16] (Mo.App.1956).

Appellant cites *Sims v. Amos*, 340 F.Supp. 691 (M.D.Ala.1972), affmd., 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972), for the proposition that appellant should be awarded attorney's fees because he was acting as a private-attorney-general. We note that the Supreme Court has recently in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), rejected the private-attorney-general concept as an intrusion upon the prerogative of congress to decide when private litigation should be encouraged by the awarding of attorney's fees. As the concept has never been a part of Missouri law, we decline to adopt it here and finding no bad faith, appellant's claim for fees is denied. Costs on this appeal are to be borne by respondent City of Pacific.

The judgment of the trial court is reversed and modified in part as set out herein.

DOWD, P. J., and CLEMENS and WEIER, JJ., concur.