John H. Schoeberlein City Manager Pompano Beach
QUESTIONS:
1. Does a municipality have the power to `split' or otherwise alter election precincts established by the board of county commissioners in order to create uniform city commission districts for the election of members of the governing body of the municipality?
2. Must city commission district boundaries be based solely upon population figures, or may they be established upon the basis of voter registration figures?
SUMMARY:
The governing body of a municipality, if authorized to do so by the city charter, has the power to delineate city commission election districts, but in doing so may not `split' or otherwise alter election precincts established by the board of county commissioners.
City commission districts may be formed upon the basis of population figures or voter registration figures, but voter registration figures may be used only insofar as the distribution of registration figures approximates the distribution of a population base.
AS TO QUESTION 1:
Your first question presupposes that the governing body of the city possesses the power to redistrict the city for the purpose of requiring that the city commissioners be elected solely by voters in the designated city commission districts in which they reside. Your letter states that the city commissioners are now required to be elected by a citywide vote, presumably by the terms of the existing charter act. Section 166.021(4), F. S. 1977, in pertinent part specifies that no changes in a special law or municipal charter are permitted with respect to `the terms of elected officers and the manner of their election' (Emphasis supplied.) without the approval by referendum of the electors of the municipality as provided in s. 166.031, F. S., relating to charter amendments. Similar language was employed in s. 11(1)(a), Art. VIII, State Const. 1885, which provided that the Dade County Charter would, inter alia, fix the `method of election' of the Board of County Commissioners of Dade County. In construing this provision, the Supreme Court of Florida in the case of Dade County v. Young Democratic Club, 104 So.2d 636, 638 (Fla. 1958), stated as follows:
 `Method' has to do with the way or means of doing a thing. It is often referred to as the mode, plan, design or manner in which a project is executed.
Accord: In Re Advisory Opinion to the Governor, 116 So.2d 425,428 Fla. 1959), and AGO 075-158 (applying the above definition to the similar phrase `manner of their election' in s. 166.021(4) and concluding that said section governs `the filling of all vacancies on a municipal legislative body').
It is clear that a change from subdistrict residency requirements for city commissioners who are elected by citywide vote to the election of city commissioners from singlemember districts, which is the substance of the proposal outlined in your letter, is a change in the method, way, means, plan, design, or manner in which city commissioners are elected. Compare Dade County v. Young Democratic Club, supra, in which the court held that conducting county commission election on a nonpartisan basis was a `method of election' controlled by the Dade County Charter within the meaning of s. 11(1)(a), Art. VIII, State Const., 1885, with AGO 074-25, in which I gave my opinion upon the applicability of s. 166.021(4),supra, to a proposed change in the Pensacola City Charter. The Pensacola City Charter provided for the election of ten city council members, two from each of five wards. Although elected by citywide vote, each city council member was required to reside in the particular ward from which he or she ran for office. Any city council member who ceased to do so would immediately forfeit his or her office under the terms of the charter. It was proposed that the charter be amended to permit a council member who changed legal residence from the ward from which he or she was elected to another ward during the term of office to serve out the unexpired portion of the term. I was of the opinion that such a proposed change of the city charter was not subject to the requirements imposed with reference to the `manner' of election of city commissioners by s. 166.021(4):
 The requirement that a councilman be a resident, qualified voter of his ward is a qualification for office. There is nothing in [s. 166.021(4)] which requires a referendum of the electorate in order to change charter provisions relating to qualifications for office. [Attorney General Opinion 074-25.]
The proposal outlined in your letter would do more than establish qualifications for office; it would, as above noted; change the manner in which city commissioners in the City of Pompano Beach are elected. Therefore, the proposal you describe is subject to s.166.021(4), F. S. 1977, so that, before the city charter may be amended in this fashion, the proposal you describe must be submitted to a referendum of the electors of the city pursuant to s. 166.031, F. S.
With reference to providing for city commission districts by charter amendment, s. 2(a), Art. VIII, State Const., provides that city charters may be amended pursuant to general or special law. Sections 166.031 and 166.021(4), F. S. 1977, are such general laws. Further, under s. 2(b), Art. VIII, State Const., municipalities have such governmental, corporate, and proprietary powers as are not `otherwise provided by law.' No law provides for the delineation of city commission districts. Cf. Ch. 165, F. S., providing for municipal incorporation, and Ch. 98, F. S., part of the Florida Election Code, neither of which contains any provisions even remotely related to the area under discussion. Neither does s. 6, Art. VI, State Const., present a bar to the exercise by a municipality of the power to establish city commission districts for the municipal purpose (defined in s.166.021(1) and (2)) of electing city commissioners solely by vote of the electors residing in each defined district. That constitutional provision states as follows:
 Registration and elections in municipalities shall, and in other governmental entities created by statute may, be provided by law.
`Registration' is the method provided for ascertaining those individuals who qualify as voters. State ex rel. Morford v. Tatnall, 21 A.2d 185, 189 (Del. 1941); People ex rel. Stapleton v. Bell, 23 N.E. 535 (N.Y. 1889). It has no apparent relation to the power to define city commission districts. `Elections' is a term which has primary reference to the very act of selecting a person to fill an office, as opposed to the acts necessary to prepare for the exercise of such a selection:
 The word `election', when standing alone, is defined as the act of choosing; choice; the act of selecting one or more from others. [Alexander v. Booth, 56 So.2d 716, 719 (Fla. 1952).]
Accord: In Re Advisory Opinion to the Governor, 116 So.2d at 428
(primary meaning of `election' is the act of choosing); Nelson v. Robinson, 301 So.2d 508, 510 (2 D.C.A.), cert. denied,303 So.2d 21 (Fla. 1974) (`paramount purpose of an election' is to afford the means and opportunity for `a full, free and open choice'); and AGO 074-311 (primary meaning of `election' is the act of choosing). Thus, in the case of Pearson v. Taylor, 32 So.2d 826
(Fla. 1947), the Florida Supreme Court directed the trial court to dismiss an election contest of a local referendum held on the question of prohibiting the sale of liquor, a contest filed on the ground that the referendum was initiated by a petition which contained fewer than the minimum number of signatures established by statute for initiating such a referendum. The court's action was based upon the rationale that matters occurring before an `election' form no part thereof:
 To hold an election is to make a choice. . . . The duties required to be done leading up to the election, while in many respects may be mandatory, are in no respect a part of the election. [Pearson v. Taylor, supra, at 827.]
Similarly, the apportionment of city commission districts prior to an election does not form a part of the election. Apportionment or districting or redistricting is a geographical division of territory for the purpose of electing representatives of the people of such territory to governments, not an election. Section 6, Art. VI, supra, would therefore appear to be inapplicable to the exercise of such power by municipalities in connection with the election of members of the city council. Since the power to define city commission districts is not a power prohibited to municipalities (s. 166.021(1), F. S.) or `expressly preempted to state or county government by the constitution or by general law' (s. 166.021(3)(c)) or `otherwise provided' by law (s. 2(b), Art. VIII, State Const.), it would appear that the governing body of a municipality may by ordinance submit a charter amendment to the city electors for approval to establish the districts from which members of the municipality's governing body will be elected solely by the vote of the voters residing therein.
Turning now to the specific question presented by your inquiry, s. 98.031, F. S. 1977, vests the board of county commissioners with limited authority to `alter or create' county precincts upon recommendation and approval of the county supervisor of elections. The only involvement in the alteration or creation of county precincts which the governing body of a municipality may have is stated in s. 98.091(1), F. S. 1977:
 The board of county commissioners, with the concurrence of the supervisor of elections, may arrange the boundaries of the precincts in each municipality within the county to conform to the boundaries of the municipality, subject to the concurrence of the governing body of the municipality. . . .
The division of a county into county voting precincts cannot be said to be a municipal, governmental, corporate, or proprietary power, nor something done for a municipal purpose. This power is instead one `otherwise provided' by law (i.e., by ss. 98.091, 98.031, supra) within the meaning of s. 2(b), Art. VIII, State Const. The only `power' municipalities may exercise in this regard is to concur or disagree with the exercise of the discretionary authority granted by s. 98.091 to the board of county commissioners to establish (with the concurrence of the county supervisor of elections) the boundaries of the county precincts in a municipality within the county in conformity with the boundaries of the municipality.
As a result of the foregoing analysis, it would appear that a municipality must, after an amendment of the city charter where such would be necessary as earlier indicated, redistrict in such a manner as to align the boundaries of its proposed city commission districts with the lines or geographic boundaries of the county precincts within the municipality and with the boundaries of the municipality. Even if, and I express no opinion on this subject, a municipality possesses the power to create its own precincts or wards for use in city commission elections, a municipality possesses no powers of voter registration. The registration of electors for all elections is a function confided to the office of the county supervisor of elections by s. 98.041, F. S. 1977:
 A permanent single registration system for the registration of electors to qualify them to vote in all elections is provided for the several counties and municipalities. This system shall be put into use by all municipalities and shall be in lieu of any other system of municipal registration. Electors shall be registered in pursuance of this system by the supervisor [of elections] or by a deputy supervisor, and electors registered shall not thereafter be required to register or reregister except as provided by law.
See, e.g., Richey v. Indian River Shores, 337 So.2d 410, 412-13 (4 D.C.A Fla., 1976), aff'd, 348 So.2d 1 (Fla. 1977), (the registration system provided for in s. 98.041 is `in lieu of all other registration systems') and AGO 072-221 (Florida Election Code vests responsibility for registration of voters `in the several county supervisors of elections'). Also see AGO 074-90 (permanent single registration system established by s. 98.041 `is mandatory for all municipalities'); AGO 073-484 (Legislature, by enacting s. 98.041, `has preempted all matters of municipal voter registration'); and AGO 073-426 (same). Thus, municipalities have no legal or practical alternative but to use county precincts as the basis for city commission districts. Otherwise, the city will first have to seek the assistance of the county supervisor of elections in recommending to the board of county commissioners any feasible changes in the boundaries of county precincts lying either wholly within or partly within and partly without the city limits.
AS TO QUESTION 2:
It is clear that population figures must be used as the basis for city commission districts, and that voter registration figures may not be used except insofar as the distribution of registration figures approximates the distribution of a population base. Avery v. Midland County, 390 U.S. 474, 481, 484-85 (1968) (equal population basis of one person, one vote principle extended to districts for all `units of local government having general governmental powers over the entire geographic area served by the body'); Moore v. City of Pacific, 534 S.W.2d 486, 503-04 (Mo.App. 1976) (applying principle stated in text to basis of districting for city aldermanic wards). See Perry v. City of Opelousas,515 F.2d 639, 641 n. 2 (5th Cir. 1975) (court-ordered city council districts based upon population figures); Yelverton v. Driggers,370 F. Supp. 612, 614-15 (M.D.Ala. 1968) (violation of one person, one vote principle alleged as to city voting wards; such claim must be based primarily upon population figures); and AGO 075-143 (one person, one vote requirement founded on concept of `population equality'). Cf. In re Apportionment Law,263 So.2d 797, 802 (Fla. 1972) (quoting United States Supreme Court to effect that population is controlling criterion of validity of legislative apportionment plans). The reason that population figures are used as the basis of districting was stated by the Supreme Court of the United States in the case of Burns v. Richardson, 384 U.S. 73, 92-93 (1966), as follows:
 Use of a registered voter or actual voter basis presents an additional problem. Such a basis depends not only upon criteria such as govern state citizenship, but also upon the extent of political activity of those eligible to register and vote. Each is thus susceptible to improper influences by which those in political power might be able to perpetuate underrepresentation of groups constitutionally entitled to participate in the electoral process, or perpetuate a `ghost of prior malapportionment.'
Prepared by: Patricia R. Gleason, Assistant Attorney General
Dennis J. Wall Legal Research Assistant